## NEW YORK SUPERIOR COURT.

### BENJAMIN F. HOWE agt. JAMES H. SEARING.

The sale of the *good will of a business* does not transfer a right to the use of the vendor's *name of trade*. (MONCRIEF, J., *dissenting*.)

Where the plaintiff sold to the defendant's assignor his lease of the premises No. 432 Broadway, New York, known by the name of "Howe's Bakery," and stock in trade, with "the good will of the business of baking, now or heretofore carried on by me in the city of New York."

*Held*, that the plaintiff was entitled to an *injunction*, to restrain the defendant from designating such bakery establishment as "Howe's Bakery," and from otherwise using the name of "Howe" in the business, so as to induce the public to believe that the business carried on at 432 Broadway was conducted by Howe.

*General Term, April,* 1860.    *Present* :

HOFFMAN, PIERREPONT *and* MONCRIEF, *Justices.*

THIS is an action brought by Mr. Howe, the celebrated baker, to restrain the defendant from designating the bakery establishment kept by him at No. 432 Broadway, New York, as "Howe's Bakery," and from otherwise using the name of Howe in the business, so as to induce the public to believe that the business carried on at 432 Broadway is conducted by Howe.

The action was tried some time since at special term, and upon the trial it was proved that about eight years ago Mr. Howe was carrying on this business at 432 Broadway, and had done a large and lucrative business there ; and, during all the time he carried on the business, the premises had been known by the name of "Howe's Bakery," and that during that time they had gained great celebrity by that name ; that about eight years ago Howe sold out his lease of the premises, and all the stock, wagons and fixtures used by him in the business, together with the "good will" of the concern, to one Baker, and covenanted not to resume the same business in the city of New York, without Baker's consent ; that Baker thereupon

commenced the same business at the same place, keeping up the old signs, and continuing to use the name of Howe upon the wagons and bread tickets, the same as his predecessor had done; that Howe at first assented to this use of his name in Baker's business, but after the lapse of some time remonstrated in a friendly way against it; that subsequently, and shortly before the commencement of this suit, Howe, desiring to return to the business, bought of Baker the privilege of resuming the business at 850 Broadway, covenanting, however, in the agreement then made, " *not in any manner to interfere with the business carried on at No.* 432 *Broadway, known as Howe's Bakery;*" that immediately after this agreement with Baker, Howe did resume his business of a baker at 850 Broadway, and has since continued the same there ; that Baker afterwards sold out his lease, stock, wagons, fixtures, &c., used in the business at 432 Broadway, to Searing, the defendant in this action, conveying to him all the rights acquired by Baker by his purchase from Howe, subject to Howe's right to do business by virtue of the subsequent agreement alluded to; that afterwards the defendant continued the same business at the old stand, and also continued the use of the name of Howe on the signs, wagons, bread tickets, &c., used in connection with the business at 432 Broadway. It was also proved, on the trial, that the use of Howe's name by the defendant, as stated, was calculated to mislead the public, and had induced persons to deal at 432 Broadway, under supposition that they were dealing with Howe, who would otherwise have dealt at Howe's place.

Judgment was rendered in favor of the plaintiff, and a decree was entered in the action restraining the defendant from in any manner using Howe's name in the business at 432 Broadway.

From this judgment the defendant appealed to the general term. Plaintiff's proceedings to enforce the injunction have been stayed, in the meantime, by order of the court,

and continue stayed until the determination of the appeal
defendant has taken to the court of appeals, from the
judgment of the general term, recently entered.

The appeal to the general term was argued last fall
before Judges HOFFMAN, PIERREPONT and MONCRIEF, and a
decision has been recently rendered, and judgment has
been entered thereon, affirming the judgment of the special
term, Justices HOFFMAN and PIERREPONT being for affirm-
ance, and Justice MONCRIEF dissenting.

LUTHER R. MARSH, *for appellant.*

The main points taken by appellant were,

1st. That the right to use Howe's name passed to Baker
and his assigns, by the conveyance to Baker in the origi-
nal agreement, of the " good will " of the concern.

2d. That by years of acquiescence in the use of the
name by Baker, Howe had estopped himself from disputing
the right of Baker's grantee to use it.

3d. That Howe's recognition of the premises as " Howe's
Bakery," in his subsequent agreement with Baker, was
conclusive evidence of what Howe understood had passed,
and intended should pass, by conveyance of "good will."

LAWRENCE, WORRALL and MOSES ELY, *for respondent.*

By the Court, HOFFMAN, Justice.    The first and the most
important question in the cause is what right passed to
Baker, under the sale and transfer to him in January, 1852,
of the leasehold premises, stock and trade, with · "*the good
will of the business* of baking, now or heretofore carried on
by me in the city of New York."

The authorities referred to, do in general describe the
good will of a trade "as a probability that the old custo-
mers will resort to the old place."    Judge STORY describes
it as " the advantage or benefit which is acquired by an

establishment beyond the mere value of the capital, stock, funds or property employed therein, in consequence of the general public patronage which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill, or affluence, or punctuality, or from accidental circumstances, or even from ancient partialities or prejudices." (*Story*, § 99.)

It is, I apprehend, a well settled rule, that the good will of a partnership business does not survive to a continuing partner. It belongs to the firm as much as the ordinary stock in trade, and must be disposed of in some manner for the benefit of the firm. The case of *Lewis* agt. *Langdon* (7 *Simons' R.*, 421), which seems to assert a different rule, is not the law of the court to this point, for which it is frequently cited. (*Story on Partnership*, § 99.)

But the decision turns upon the right to use the name of the old firm with a modification, and it is hereafter more particularly noticed.

*Douglass* agt. *Hammond* (5 *Vesey R.*, 539) does indeed explicitly decide that the good will, speaking of it generally, does survive to the remaining partner; that a sale of it cannot be compelled by the representative of the deceased partner ; that it is not partnership stock of which the executor may compel a division, but belongs of right to the survivor.

In the case of *Dougherty* agt. *Van Nostrand* (1 *Hoffman's Ch. R.*, 68), before me, as assistant vice-chancellor, I thought that this case could not be supported.

I have acted at special term in this court on two cases, after a reconsideration of the point, upon the same principle as in *Dougherty* agt. *Van Nostrand*.

Vice-Chancellor SANDFORD in *Williams* agt. *Wilson* (4 *Sand. Ch. R.*, 379), decided in the same manner, recognizing *Dougherty* agt. *Van Nostrand*.

Good will resolves itself into reputation. That in the absence of proof to the contrary, or express agreement,

must be presumed to have been the result of joint skill, capital and industry, when built up by the parties themselves, or by a joint purchase, when it has been reared by a predecessor. As the acquisition was joint, the value must be shared.

Mr. Bell, in his commentaries, observes (*vol.* 2, *p.* 645) that the good will of a mercantile or literary establishment seems to form a part of the common stock.

He cites *Crawshan* agt. *Collins* (.15 *Vesey R.*, 227), *Curtwell* agt, *Lye* (17 *Vesey R.*, 335), *McCormick* agt. *McCubben* (4 *July*, 1822, 1 *Shaw & Ballantine R.*, 540.)

Lord ELDON concurred in Sir SAMUEL ROMILLY's doubt as to the decision in *Hammond* agt. *Douglass*, and that is equivalent to an express overruling it. It was Lord ELDON's manner of doing so.

In the late case of *McDonald* agt. *Richardson* (1 *Geffard's R.*, 81), before Vice-Chancellor STUART, this point seems to be taken for granted. A surviving partner had carried on the same business for some time after the death of his associate, and was called upon in the suit to account. The chief clerk was directed to ascertain the value of the testator's share of the good will of the partnership business, among other things. The survivor was also executor, but it is plain this could not be the ground of a charge.

*Chissum* agt. *Dewes* (5 *Russell R.*, 29) settled that the mortgagee of a lease, under which the business was carried on, was entitled to receive the avails of the sale of lease and good will. The latter constituted the chief part of the value.

The good will of a trade, says PINDAL, Ch. J., in *Hitchcock* agt. *Cohen* (6 *Adolph. & Ellis*, 438, 446), " is a subject of value and price. It may be sold, bequeathed, or become assets in the hands of the personal representative of a trader. If the restriction as to time is held to be illegal, because extended beyond the period of the party carrying on the trade himself, the value of such good will,

considered in these various points of view, is altogether destroyed."

In *Elves* agt. *Crofts* (10 *Common Bench Rep.*, 241), (1 *J. Scott*), a butcher assigned for the residue of his term, premises in which he had carried on business, together with the fixtures and *good will* of the trade. He cove- nanted that he would not at any time thereafter, either by himself, or as agent or journeyman for another, set up or be employed in the trade or business of a butcher, within five miles from the premises assigned. It was held not an unreasonable restraint in respect either of time or dis- tance, and that the covenant did not cease on the expira- tion of the term, or on the covenantee's ceasing, by himself or his assigns, to carry on the business assigned.

The court referred to *Hitchcock* agt. *Cohen* (*ut supra*), as decided in the exchequer chamber, and as settling that a restriction, reasonably limited as to space, but enduring for the life of the party restrained, was valid, as the only effectual mode of securing to the covenantee the full bene- fit of the good will of his trade. "Cases may be con- ceived in which, notwithstanding the facts found by the jury, that the covenantee had ceased, either on the pre- mises or elsewhere, or by any assignee or licensee, to carry on the business, the good will assigned might not be at once extinguished; and if consideration of time or degree be permitted to affect the right to enforce such a covenant, its value would be diminished, and the saleable quality of the good will, which, according to all the recent authori- ties, is deserving protection, would be affected."

It seems also to be well settled, that when a partnership is dissolved, and there is no express stipulation upon the subject, the remaining partners are not under any obliga- tion to refrain from setting up the same trade or business, and forming a new establishment for carrying on the same after the sale of the late business. The master of the rolls stated this rule in *Davies* agt. *Hodgson* (25 *Beavan's R.*,

177), referring to *Cook* agt. *Collingridge,* as reported by *Mr. Collyer,* § 322.

The first decree in that case is found in *Jacobs' Report,* 623, and *Mr. Collyer* gives the directions of Lord ELDON, drawn by himself upon a petition for further carrying out the decree.

These points may be deduced from the minute provisions of this decree.

A partnership having terminated by lapse of time, there was nothing to prevent some of the members forming a new establishment to carry on the same business. That the good will, treated as the value of the chance of customers continuing to deal, could not be estimated upon the same principles as when a retiring partner sold his whole interest to continuing partners, and retired from the trade altogether. A buyer of the premises, the leasehold, shop, &c., would purchase something which could not be treated as of no speculative value, or not to be regarded in the sale. He would get the chance of retaining the old customers, getting them to come to the old place ; but this chance, and therefore the value would be materially affected by the probability of the customers following the former members to their new establishment.

Nothing is found in this case as to the former name, by continuing partners in any form, whether modified or not.

In *Lewis* agt. *Langdon* (7 *Simon's R.,* 421), before noticed, Stephen Brookman and Joshua Langdon carried on business under the firm of Brookman & Langdon. Brookman died, and then Langdon died, the latter appointing William Langdon his executor and residuary legatee. He died, and administration was granted to Fruzan Langdon, his widow. The business was carried on at the same place, and under the same firm name, by Joshua Langdon, William Langdon, and Fruzan Langdon in succession ; Fruzan Langdon took the plaintiff (Lewis) into partnership. Fruzan Lang-

don then died, having appointed Augustus Langdon and two others her executors. James Lewis then took the plaintiff (Warren) into partnership, and they carried on the business at a different place from the original location, under the firm of James Lewis & Co., successors to Brookman & Langdon. The bill was to restrain them from using that name in the business. There was no agreement in the case, which does not seem to me of much importance on the main question.

The vice-chancellor said : "I cannot but think, when two partners carry on a business together, under a given name, that during the partnership it is the joint right of them both to carry on the business under that name, and that upon the death of one of them, the right which they before had jointly, becomes the separate right of the survivor."

It is to be observed, upon this case, that the defendant had not a shadow of right to the use of the firm name. The plaintiff had the right, so far as any existed in Joshua Langdon, as survivor of Brookman & Langdon. Had a representative of Brookman been defendant, the question would have distinctly arisen.

In *Clinton and others* agt. *Douglass* (1 *H. R. V. Johnson's R.*, 176), before Vice-Chancellor Wood, 1859, the business had been carried on for some time under the firm name of John Douglass & Co. By a written instrument, the defendant sold to the plaintiff " all his shares, rights and interests in the trade or business carried on by him and the plaintiffs at Bradford, in copartnership, and under the firm name of John Douglass & Co., and the good will thereof," other and comprehensive words were used to transfer the whole of the partnership goods and property, and the assignors' title therein. The defendant also leased to the plaintiff, for seven years, the premises at which the business had been carried on.

Notice of the dissolution of the old firm was given, and

the style of the new firm was Clinton, Bankhart & Huet (late John Douglass & Co).

The location of the old business was at Hall Jugs, Bradford. The defendant subsequently opened a store for the same business, next door to that of the plaintiff, leased by him, and placarded it with the name of John Douglass & Company. An injunction was granted, restraining the defendant until the hearing of the cause, "from resuming or carrying on the business of stuff merchant, at or about the immediate neighborhood of Bradford, either alone or in partnership with any other person, under the style or firm of John Douglass & Company, or in any other manner holding out that he is carrying on the business of stuff merchant, in continuation of or in succession to the business carried on by the late firm of John Douglass & Company."

The vice-chancellor enters into a very elaborate argument in the case. He holds expressly that the authorities are conclusive to the point, that the sale of the good will of a business without more, does not imply a contract on the part of the vendor not to set up a similar business himself. Upon a sale of the good will, the vendor is not precluded from carrying on a precisely similar business, with all the advantages from his own labor and industry, and from the regard people may have for him; and that, in a place next door, for example, to the very place where his former business was carried on.

But he also held that the name of a firm, that style under which its business has been carried on, is part of the good will, and passes with a sale. "The name of a firm is a very important part of the good will of the business carried on by the firm. A person says, I have always bought good articles at such a place of business; I know it by that name, and I send to the house of business identified by that name for that purpose. That the name is an important part of the good will of a business is obvious,

when we consider that there are at this moment large banking houses, and brewing firms and others in this metropolis, which do not contain a single member of the individual name exposed in the firm."

The defendant " parted with the right to the plaintiff of representing themselves to be carrying on the identical business which had been carried on by the firm of John Douglass & Company. But they did not get the right to call themselves by that name *simpliciter*. This they had not claimed, but only to use the words " late John Douglass & Co.," in other words, the right to identify their house of business, formerly carried on by *John Douglass & Company*. That name had become well known. The business was identified by that name. It is not as if he were calling himself *John Douglass* alone, and carrying on a similar business under that name."

The judgment in *Cantwell* agt. *Lye* (17 *Vesey R.*, 346), distinctly admits that although you may set up a similar business, you are not entitled, when you have sold the good will of the business, to represent that you are continuing the *identical* business; not to say that you are the owner of that which you have sold. The defendant has not contracted against setting up business in opposition to the business sold by him to the plaintiff, but he must set it up fairly and distinctly as a separate business, and not as the old established business which he has sold.

I have quoted largely from this case, as none other that I am aware of has entered so fully into the subject.

In *Cantwell* agt. *Lye*, referred to (17 *Vesey R.*, 246), Lord ELDON said : " The question is whether, upon a fair understanding or representation, agreeably to the fact, this person is carrying on the plaintiff's trade, and in this view of the case I refer to *Hogg* agt. *Kirby* (8 *Vesey R.*, 215), where the defendant had a clear right to publish a similar work, under the same title, as the plaintiffs; represented as distinct and original, but was prevented from publish-

ing his book as the work of the plaintiff, which had been partly published. So there can be no doubt that this court would interpose against that sort of fraud which is attempted by setting up the same trade, in the same place, under the same sign or name, the party giving himself out as the same person."

The law of France in relation at least to commercial partnerships, is very explicit upon this subject. The 21st article of the *Code of Commerce* is: " The name of the associates can alone constitute the firm name (*la raison sociale*). This is intended to forbid persons who succeed to the business of a deceased merchant from continuing it under his name. Credit is altogether personal. · It does not transmit itself by cession or inheritance. It is won by actions and capacity. It is not right, then, that a successor should avail himself of a fallacious credit in appropriating a firm's name, extinguished by the death of one of those who gave it the value. (*Troplong le Droit Civil*, tome 12, n. 372; *Loi Sur L'Article* 21 *of the Code of Commerce.*)

*M. Troplong* adds : " One is astonished that such a contrary practice prevailed formerly in France, and exists in England. It is a source of fraud upon a confiding public. The retirement or decease of one of the associates effaces the firm's name. Another must be created."

Thus does the case stand upon all the authorities that I have found bearing upon it ; and it would leave it without any direct authority, or even dictum in favor of the defendant, except that late and important one before Vice-Chancellor Wood.

·But it is to be noticed that by a statute of our state, entitled " An act to prevent persons from transacting business under fictitious names," passed April 29th, 1833, (*Session Laws, ch.* 281), it is enacted that " No person shall hereafter transact business in the name of a partner (quere person) not interested in his firm," and where the

designation 'and company,' or 'Co.,' is used, it shall represent an actual partner or partners." By section 2, the violation of ·this provision is made a misdemeanor.

By a statute, passed April the 17th, 1854 (*Session Laws*, *ch.* 400), a copartnership name may be continued by some, or any of the copartners, their assignees or appointees, provided a certificate, as prescribed by the act, is filed in the county clerk's office, and published as directed. But by section 4, the provisions are only to apply to firms having business relations with foreign countries. A bill to extend this provision is now before the legislature.

It seems to me that the principle and object of this statute extends to such a case as the one before us. It recognizes the principle as one of public policy, that the business must be transacted under the name of the actual parties doing it, and not under other names. It applies to persons in existence,. as well as when a partner has retired or is dead. It accords with the French laws, and involves or warrants the proposition that the naked sale of the good will of a business does not transfer a right to the use of the vendor's name of trade.

We do not think that there is anything in Howe's inaction, or the employment of the term of Howe's Bakery, in the instrument of the 28th day of April, 1858, which can entitle the defendants to use the name.

Moncrief, Justice (*dissenting*).—Whether or not the term ·" *good will*," under all circumstances, includes the name under which the business originated or was continued, or became a thing of specific value, is not in the present instance necessary to determine.

A person not a lawyer would not imagine that when the "good will" and trade of a retail shop were sold, the vendor might the next day set up a shop within a few doors, and draw off all the customers. The "good will" of such a shop, in good faith and understanding, must

mean all the benefit of the trade, and not merely a benefit of which the vendor might the next day deprive the ven- dee. This was the language used by the vice-chancellor, in 2 *Madd. Ch. R.*, 188, 219, in which the decision of Lord ELDON (17 *Vesey R.*, 346) was cited, and in reply to the proposition there laid down, " that good will was the pro- bability that the old customers will resort to the old place."

(This clearly will not be applicable to the present case, as the transfer of the lease, without the additional provi- sion in the agreement for the sale of the good will, fully and practically secured the old stand, with whatever pro- babilities were incident to it.)

Story defines " good will " to be the advantage or bene- fit acquired by an establishment beyond the mere capital or value of its stock, in consequence of the general public patronage and encouragement which it receives from con- stant or habitual customers, on account of its local posi- tion or common celebrity, or reputation for skill and affluence, or punctuality, or from the accidental circum- stances or necessities, or even from ancient partialities or prejudices.

Courts of equity are frequently called upon to interpose and prevent a person from using *the name* of another in a business or concern, for the fraudulent purpose of imposing on the public, and supplanting the other in the *good will* of his concern. (3 *Kent, 5th ed.*, 64, *note;* 2 *Kern. R.*, 313; 6 *Beavan R.*, 72; 8 *Paige R.*, 75; 4 *Paige R.*, 479; 2 *Barb. Ch. R.*, 101; 2 *Sand. Ch. R.*, 617; *affirming Taylor* agt. *Carpenter, per* SPENCER, *Senator.*)

The plaintiff adopted, appropriated, and used the words or name "Howe's Bakery," and by that name his esta- blishment became known, and was extensively patronized, and was a thing having specific value. The plaintiff so avers in his complaint.

If the plaintiff, previous to the transfer, in 1852, to

Baker, the assignor of the defendant, had sought the aid of equity to restrain a person, of the same surname, engaged in the same business in the city of New York, from using the words " Howe's Bakery," the claim would have rested not upon any exclusive right of the plaintiff to appropriate and monopolize these words, the one being peculiar to neither, and truthful as to both, and the other a generic term not capable of appropriation, but that the words had been long used by him, and had become known as indicating articles manufactured or made at, or vended from his establishment or place of business. The ground of interposition is, that a name having been taken for the purpose of distinguishing property, the defendant is not permitted, on the false representation that articles, really the defendant's, belong to or were made or sold under the management of the plaintiff, or came from his place of business, thereby depriving the plaintiff of the fair profit of his business.

The name or words " Howe's Bakery," was nothing but a trade mark, and as such is now sought to be protected by the plaintiff.

The name or trade mark passed by the assignment and transfer of the " *good will*," and if it was not the thing itself it was an integral part of it.

The contract of the parties leaves no room for conjecture as to their intention.

The stock in trade, fixtures, &c., were specifically mentioned; the leases were distinctly set forth; the art and mystery of the business was provided for by an express covenant, to teach whomsoever the vendee might select, and lastly, not least, after agreeing for the sale of the " good will," it was stipulated that the vendor (plaintiff) should not, directly or indirectly, engage or be concerned in the same business in the city of New York, without the consent of the vendee (Baker).

Again, this clear understanding of the parties, and of

this construction of their agreement, is definitely fixed by the long acquiescence of the vendor, and of his requesting and obtaining leave to commence the business at a particular place, and use the name within those bounds.

It seems to me the statute has no application to the case under consideration ; the title clearly indicates the intent to prevent mischief by the use of a fraudulent, because entirely fictitious designation, the word " Co.," with no physical existence to represent it.

The name " Howe " had a living physical existence to support it.   It was not therefore fictitious.

The name " Howe " required nothing to sustain it.   As a trade mark, it is immaterial whether it was the name of animate or inanimate creation, or the purest effort of fancy on the part of its originator, possibly the more original in its character, the better would be the protection offered to it, the nearer it approach to the right to be patented.   The plaintiff cannot avail himself of the statute, even if it did apply.   Having agreed to dispose, and actually conveying the thing alleged to be prohibited, it does not lie with him to complain of his own violation of law, or a fraudulent representation to his vendee.

No such point was taken by the plaintiff upon the argument of the appeal.

The plaintiff might dispose of his credit.   That is nothing more than a reputable name or character, and its influence.

The injunction should have been refused, and the complaint dismissed.   The judgment of the special term should be reversed, &c.