BURTON *v.* STRATTON and others.

(*Circuit Court, E. D. Michigan.* July 3, 1882.)

1. TRADE-MARKS—MERE WORDS.

Mere words may become valid trade-marks, when they are merely arbitrary, or are indicative of origin or ownership in the original proprietor.

2. SAME—WHEN PROTECTED.

Words which have acquired a significance in the marks as expressive only of the name or quality of an article cannot be appropriated as a trade-mark. But

if the primary object of the trade-mark be to indicate origin or ownership, the mere fact that the article has obtained such a wide sale that the mark has also become indicative of quality, is not of itself sufficient to debar the owners of protection, or make it the common property of the trade. But if the name be suffered to come into general use without objection from the proprietor, it may become merely generic, or indicative of quality.

3. SAME—AN APPURTENANCE—SALE OR ASSIGNMENT OF.

A trade-mark, indicative of origin or ownership in the proprietor of a certain business, may be sold or assigned by him as an appurtenance of such business, and the assignee may become entitled to the exclusive use of such mark, even as against such proprietor himself. *Held,* that the right to use the words "Twin Brothers," in connection with portraits of the twins, had been lawfully assigned to the plaintiff, and that he was entitled to an injunction against one of the twins who had set up a separate establishment, and was making use of this trade-mark in manufacturing yeast.

In Equity.

This was a bill in equity to enjoin the use of a trade-mark. The bill set forth that the plaintiff had, for a long time, made a certain yeast, put up in wrappers and labels, specimens of which were attached to his bill; that since 1877 he had claimed the words, devices, figures, and arrangements shown by said label as a trade-mark, especially employing the figures of two heads in an oval setting, and the words "Twin Brothers Improved Dry Hop Yeast," and "Twin Brothers" in connection with the yeast as a trade-mark; that the defendant Stratton and his brother Thomas J. Stratton were the two men represented by the two figures; that they originated the yeast, and were the original owners of the trade-mark; that defendant Jackson B. Stratton, before 1867, made and sold this yeast under the name of "Twin Brothers Improved Dry Hop Yeast" in the state of Ohio, and in 1867 complainant and said defendant Stratton formed a partnership and made and sold this yeast; that late in the year 1867 complainant bought out from said Stratton his interest in the partnership and trade-mark, paying therefor $4,000; but he continued to employ Stratton, under various agreements, until the year 1877, in the manufacture of this yeast; that in 1869 he purchased from Thomas J. Stratton the factory theretofore leased from him, and his interest in the trade-mark, and had since continued to use the same, with the wrappers and labels, and particularly the term "Twin Brothers Yeast," both separately from and in connection with the bust figures shown upon the wrappers; that at the time of his purchase from the defendant the yeast was not extensively known, and the demand therefor was not large, but that since said purchase the business has been greatly extended and the demand for the yeast is now large and constant; that defendant Stratton and others were making a spurious

article and selling the same as "Twin Brothers Dry Hop Yeast," and using wrappers and labels like those of the plaintiff; that the spurious article is a fraud upon the public, who purchase it believing it to be the genuine Twin Brothers yeast made by the plaintiff.

Prayer: That the defendants be enjoined from imitating the label, and from selling any yeast made by them, or any other person than the plaintiff, as and for the "Twin Brothers" yeast, and in using the name of Twin Brothers in any way, shape, or form in connection with the sale of yeast.

The defendants claimed an absolute right to use the words "Twin Brothers Yeast," in so far as they constituted the original trade-mark of Stratton Brothers, on the ground that Stratton never sold his interest in such trade-mark to complainant; that a court of equity will not protect plaintiff in the use of his trade-mark, although he bought it of Stratton, because in using it he represents to the public that he was the originator, and that it indicates an origin in himself, when such is not the truth; that Twin Brothers is a generic name of a compound made under Stratton's discovery; and that the defendants or any other person making the genuine article may sell it under its proper name. They deny the charge that the yeast made by them is a spurious article, and claim that it is the genuine original compound discovered by defendant Stratton, and substantially the same as made by the complainant.

*C. F. Burton* and *Alfred Russell*, for plaintiff.

*H. C. Wisner*, for defendant.

BROWN, D. J. We think there is a decided preponderance of testimony in favor of the plaintiff's theory that at the time his partnership with the defendant Stratton was dissolved he purchased not only his interest in the business, but also his moiety of the trade-mark. Indeed, the defendant seems to have had very little else of any value to sell. Plaintiff had put but a thousand dollars into the venture. Defendant had contributed nothing but his attention and skill. The partnership lasted but eight or nine months, and the business done was very limited. They would get a little meal and make a small quantity of yeast; then they would shut up the factory and go out and sell it, get a little more meal, and start again. After conducting the business in this way about six months the demands of their creditors became so urgent that plaintiff was obliged to advance $300 more to continue it. Soon after, an investigation of the books showed their affairs to be in such a precarious condition that defendant Stratton wanted to go out of the business, and the plaintiff bought.

his interest and paid him $4,000. At the time of the sale there appears to have been no stock on hand, and the factory had been shut down for some six weeks. Under these circumstances it seems to us quite improbable that they could have made ten or twelve thousand dollars in nine months, or that there could have been debts due the firm to the amount of $8,000. Add to this the testimony of several witnesses who swear that defendant stated to them repeatedly, and in a regretful manner, that he had sold his interest in the trademark, and had nothing else to sell to the plaintiff, and his subsequent conduct after he left plaintiff's employ in commencing to sell under the name of the "Standard Yeast," we can entertain but little doubt of the fact, notwithstanding the agreement was not in writing.

The principal question involved in this case is whether the words "Twin Brothers" are a trade-mark of such a character as entitles the plaintiff to be protected in his monopoly of them. The point is certainly not free from difficulty. There are few classes of cases in the whole domain of the law so difficult to reconcile as those wherein the validity of a trade-mark is discussed. The following propositions, however, may be considered as settled:

1. That a court of equity will enjoin unlawful competition in trade by means of a simulated label, or of the appropriation of a name; as where the defendant appropriates the name of a hotel conducted by the plaintiff, or imitates his label upon preparations. *Howard* v. *Henriques*, 3 Sandf. 725, (*Irving House Case ;*) *Woodward* v. *Lazar*, 21 Cal. 448, (*What-Cheer House Case ;*) *Howe* v. *Searing*, 10 Abb. Pr. 264, (*Howe's Bakery Case ;*) *McCardel* v. *Peck*, 28 How. Pr. 120, (*McCardel House Case ;*) *Williams* v. *Johnson*, 2 Bosw. 1, (*Genuine Yankee Soap Case ;*) *Day* v. *Croft*, (2 Beav. 488, (*Day & Martin Blacking Case ;*) *Davis* v. *Kendall*, 2 R. I. 566, (*Pain-Killer Case ;*) *Meriden Britannia Co.* v. *Parker*, 39 Conn. 450. The ground of interference in this class of cases is fraud; that is, the attempt to palm off the goods of the defendant as the goods of the plaintiff.

2. A court of equity will not protect a person in the exclusive use of a word which expresses a falsehood; as, if the article bears the word "patented" when in fact it is not patented, or exhibits an untruth as to the place of manufacture or composition of the article. *Leather Cloth Co.* v. *American Leather Cloth Co.* 11 H. of L. 531; Brown, Trade-Marks, § 72; *Flavel* v. *Harrison*, 10 Hare, 467; *Partridge* v. *Menck*, 2 Barb. Ch. 101; *Pidding* v. *How*, 8 Simons, 477, (*Howqua Mixture Case ;*) *Palmer* v. *Harris*, 60 Pa. 156, wherein the trade-mark indicated that certain cigars were made in Havana, when

in fact they were made in New York; *Fetridge* v. *Wells*, 13 How. Pr. 385, (*Balm of Thousand Flowers Case ;*) *Phalon* v. *Wright*, 5 Phila. 464, (*Night-Blooming Cereus Case ;*) *Cocks* v. *Chandler*, L. R. 11 Eq. 446, (*Reading Sauce Case ;*) *Conwell* v. *Reed*, 128 Mass. 477, (*East Indian Remedy Case.*)

3. That no one can extend his monopoly of a patented trade-mark. By the expiration of the patent the public acquires the right not only to make and sell the article, but to make and sell it under the name used by the patentee. *Singer Manuf'g Co.* v. *Stanage*, 6 FED. REP. 279; *In re Richardson*, 3 O. G. 120; *Tucker Manuf'g Co.* v. *Boyington*, 9 O. G. 455.

4. A person cannot, by means of a trade-mark, monopolize the name of the place where the article is manufactured. *Canal Co.* v. *Clark*, 13 Wall. 311, (*Lackawanna Coal Case;*) *Brooklyn White Lead Co.* v. *Masury*, 25 Barb. 416. Nor the ordinary numerals or letters. *Manuf'g Co.* v. *Trainer*, 101 U. S. 51; *A. C. A. Case*; *Am. Manuf'g Co.* v. *Spear*, 2 Sandf. 599; *Avery* v. *Meikle*, 23 Alb. Law. J. 443. This proposition, however, has been disputed. See *Gillott* v. *Estabrook*, 48 N. Y., (*The 303 Case ;*) *Boardman* v. *Meriden Britannia Co.* 35 Conn. 402. Nor can a person monopolize a name expressive of the character or composition of an article. *Caswell* v. *Davis*, 35 N. Y. 281, (*Ferro-Phosphorated Elixir of Calisaya Bark Case.*)

5. So where the words used are expressive only of the name or quality of the article, and have acquired that significance in the market. *Am. Manuf'g Co.* v. *Spear*, 2 Sandf. 599; *Manuf'g Co.* v. *Trainer*, 101 U. S. 51; *Stokes* v. *Landgraff*, 17 Barb. 608; *Corwin* v. *Daly*, 7 Bosw. 222, (*Club House Gin Case;*) *Ferguson* v. *Davol Mills*, 2 Brewster, 314; *Choynski* v. *Cohen*, 39 Cal. 501, (*Antiquarian Book Store Case ;*) *Phalon* v. *Wright*, 5 Phila. 464; *Singleton* v. *Bolton*, 3 Doug. 293, (*Case of Dr. Johnson's Yellow Ointment ;*) *Thomson* v. *Winchester*, 19 Pick. 214, (*Thomsonian Medicine Case ;*) *Benninger* v. *Wattles*, 24 How. Pr. 204, (*Old London Dock Gin Case ;*) *Raggett* v. *Friedlater*, L. R. 17 Eq. 29, (*The Nourishing Stout Case.*)

In order that mere words may be upheld as a trade-mark they must be merely arbitrary, or they must indicate the origin or ownership of the article or fabric to which they are affixed. *Am. Manuf'g Co.* v. *Spear*, 2 Sandf. 597; *Canal Co.* v. *Clark*, 13 Wall. 322; *Falkinburg* v. *Lucy*, 35 Cal. 52; Brown, Trade-Marks, § 216; *Durham Tobacco Case*, 3 Hughes, 157; *Wotherspoon* v. *Currie*, L. R. 5 E. & I. App. 508, (*The Glenfield Starch Case ;*) *Ford* v. *Foster*, L. R. 7 Ch. App. 611, (*Eureka Shirt Case ;*) *Hier* v. *Abrahams*, 82 N. Y. 519,

*(Pride Tobacco Case ;) McAndrew* v. *Bassett,* 10 Jur. (N. S.) 550; S. C. 12 Week. R. 777, *(Anatoleo Case ;) Lee* v. *Haley,* L. R. 5 Ch. 155, *(Grimes Coal Co. Case ;) Seixo* v. *Provezende,* L. R. 1 Ch. 192, *(Seixo Wine Case ;) Braham* v. *Bustard,* 1 Hem. & M. 447, *(Excelsior Soap Case.)*

There are cases which appear to differ from those above cited, but we think most if not all of them, can be distinguished from them.

The defendant takes the ground in this case that the words "Twin Brothers Yeast" is a generic name, and indicates, not the origin or ownership of the article, but its specific quality, and that it has acquired in the market a reputation under that name. This defence appears to be somewhat of an after-thought, and it is doubtful whether it is properly before the court, since no allusion is made to it in the answer, and it was not until the case had been at issue a year and the proofs taken that defendant made an affidavit to the effect that "Twin Brothers Yeast" was the generic name of a specific article of merchandise, and that he was the only person who ever was or ever could be able to manufacture it. The defence, too, seems to be somewhat inconsistent with the previous testimony. Upon being called as a witness Stratton swore that he made a discovery of a yeast compound, and that he did not get it patented because he considered it of more value to him as a secret than as a patent. He had imparted the the secret to the employes of the plaintiff. He had also imparted it to the Judds, who manufactured "Judd Bros." yeast according to his formula; that he had also imparted the secret to one Hopper, who made the same yeast under the name of the "National Yeast;" that while a member of the firm of A. G. Smith & Co. he manufactured and sold the same yeast under the name of the "Standard" yeast; and that he manufactured the same yeast for a firm in Toledo, who sell it under the name of the "Lion Brand."

The difficulty is in distinguishing cases where the property has acquired a generic name, as indicating the quality of the article rather than its origin or ownership. One would say at once that Congress Water was an example of a generic name, since it is universally known by that name in the market; and yet the court of appeals in New York sustained it as a trade-mark, apparently upon the ground that complainants were the exclusive owners of the spring known as the Congress Spring, and that the right to use the name was passed as appurtenant to the property. The only satisfactory rule we have been able to gather from the authorities is that in each case it is a matter for the court to determine, not alone from the mark itself,

but from the testimony, whether the words have become so well known as to stand in the public eye as denoting the character and quality of the article and not its origin or ownership. Thus, if it should appear that the article had been manufactured and sold by a number of dealers under a particular name, this would be decisive that the plaintiff had no right to the exclusive use of that name. Most if not all of these generic names were at first indicative of the origin, but finally, by constant use, ceased to subserve that purpose and have become indicative of the quality. An example of this is "Fowler's Solution of Arsenic," which clearly indicates origin, but the article is nevertheless put up by druggists all over the country, and this name has become public property. We think that most if not all the cases upon this subject, when carefully examined will be found to have turned upon the extent to which the name is used, rather than upon the name itself. Thus, in the *A. C. A. Case*, 101 U. S. 51, it was said by the court that it was clear, from the history of the adoption of the letters as narrated by the complainant and the device itself, that they were only intended to represent the highest quality of ticking manufactured by the plaintiff, and not its origin. It appeared that other letters were used to indicate inferior grades of the same article.

In *Stokes* v. *Landgraff*, 17 Barb. 608, it appeared it was a practice of manufacturers of glass to designate the several qualities by names similar to those used by the parties to the action, and not by words or figures, in terms expressing the qualities. In *Corwin* v. *Daly*, 7 Bosw. 222, it appeared that the words "Club House" had been applied to articles of merchandise, including gin of a special quality, for a number of years. See, also, *Ferguson* v. *Davol Mills*, 2 Brewster, 314; *Thomson* v. *Winchester*, 19 Pick. 214; *Wollfe* v. *Goulard*, 18 How. Pr. 64, (*Scheidam Schnapps Case.*)

But if the primary object of the trade-mark be to indicate the origin or ownership, the mere fact that the article has obtained such a wide sale that the mark has also become indicative of quality is not of itself sufficient to debar the owner of protection or make it the common property of the trade. To hold otherwise would be to deprive the owner of the exclusive use of his trade-mark just at the time when it had become most valuable to him and stood most in need of protection. But if the same be suffered to come into general use without objection from the original proprietor, it becomes merely generic, or indicative of quality.

Applying these principles to the case under consideration, it is pertinent to observe that no such defence is set up in either of the

answers to the original bill, which was filed in December, 1880. In the answer of Orange Judd it is expressly averred that he is manufacturing Judd Brothers yeast; that for a number of years he manufactured yeast for the complainant of precisely the same kind as he is now manufacturing, and which said complainant sold as Twin Brothers yeast. He admits that he is selling to said Jackson B. Stratton and Asa Judd the yeast manufactured by this defendant, which, as before stated, is precisely the same kind of yeast he before manufactured for the plaintiff. He further avers that what Stratton and Asa Judd (his brother) do with said yeast this defendant does not know except from hearsay, but he denies that he is directly or indirectly using the "Twin Brothers" trade-mark, or any mark except that owned by himself, to-wit, the trade-mark of Judd Brothers; and further, that if Stratton and Asa Judd are using complainant's trade-mark, it is upon their own responsibility and without any agency or authority from him. He further, in paragraph 6, says that he is now and has been selling to the trade large quantities of the same kind of yeast which he has been selling said defendants Stratton and Asa Judd; that all said yeast sold by him is sold under the name of "Judd Brothers Yeast." The testimony also shows, as heretofore stated, that the same yeast was sold under the name of Standard yeast and of the Lion yeast.

The first intimation we have of the claim now set up is contained in the affidavit of Jackson B. Stratton, filed in December, 1881. His original defence was that he did not sell his interest in the trademark. It is true that in several of the contracts entered into between the plaintiff and defendant Stratton the yeast is spoken of as the Twin Brothers yeast, and sometimes of the "kind and quality" known as Twin Brothers yeast; and so it was undoubtedly known, as between the parties themselves, as representing the yeast of the compound of which Stratton possessed the secret; but this is no answer to the fact that it was manufactured and held out to the public under different names, such as were most convenient for Stratton. Upon the whole, it does not seem to us that the words "Twin Brothers," under the testimony, can be considered as indicating to the public the quality of the yeast, though it certainly does indicate origin and ownership in the persons whose likenesses appear on the trade-mark. The question whether this trade-mark was such a one as could be the subject of assignment to the plaintiff, and lawfully used by him, is not free from difficulty. He was not one of the Twin Brothers, nor are either of the heads in the oval figure representations of himself or of any

one now connected with him in business. But the cases are numerous in which it has been held that a party may lawfully assign and sell not only a trade-mark indicative of origin in himself, but even the right to use his own name in connection with a particular business. Several of these are cited in the recent opinion of Mr. Justice Matthews in the case of *Pepper* v. *Labrot*, 8 FED. REP. 29, in which the right to use the words "Old Oscar Pepper" were held to pass to an assignee in bankruptcy of the proprietor of a distillery and premises, even as against such former proprietor himself, who had set up a separate establishment in another county. The comments of Justice Field in this connection in *Kidd* v. *Johnson*, 100 U. S. 617, are decisive of the right of a party to sell a trade-mark used in connection with a certain business, though it be indicative of origin in himself. In the case under consideration it seems to me clear that the Strattons could lawfully transfer to the complainant, in connection with their sale to him of their interest in the business, the exclusive right to use their trade-mark. Whether such trade-mark could be assigned separate from the business to which it was appurtenant, or whether it would pass by a sale of the business alone, we are not called upon to decide. Complainant paid a valuable consideration for this trade-mark, and we think he should be protected by injunction in his right to use it.

See *Shaw Stocking Co.* v. *Mack, post,* 707, and note, 717.

## NOTE.

TRADE-MARK. A trade-mark may consist of a word, expression, device, or mark adopted as such, but not words belonging to the general public, which describe truly a known product.(*a*)　A compound word coined by a person is entitled to protection, as "electro-silicon."(*b*)　Property may be acquired in the use of the translation of a foreign word,(*c*) as "conserves alimentaires," with the coat of arms of the city of Paris;(*d*) or the word "Bismarck," used to designate a particular style of goods;(*e*) or "Bethesda," adopted to indicate origin or ownership;(*f*) or the word "Eureka;"(*g*) but words or phrases in common use(*h*) cannot be appropriated as a trade mark, as "desiccated codfish;"(*i*) as "snow-flake," applied to bread and crackers;(*j*) "straight cut," "curly cut,"

(*a*) Helmbold v. Helmbold Manuf'g Co. 53 How. Pr. 453.

(*b*) Electro-Silicon Co. v. Trask, 59 How. Pr. 189; Same v. Levy, Id. 469; or "ferro-phosphorated," Caswell v. Davis, 35 How. Pr. 76.

(*c*) Rillett v. Carlier, 61 Barb. 435.

(*d*) Godillot v. Hazard, 44 N. Y. Super. 427.

(*e*) Messerole v. Tynberg, 4 Abb. Pr. (N. S.) 410.

(*f*) Dunbar v. Glenn, 42 Wis. 118.

(*g*) Allegheny Fertil. Co. v. Woodside, 1 Hughes, 115.

(*h*) Town v. Stetson, 3 Daly, 53; Choynski v. Cohens, 39 Cal. 501; Caswell v. Davis, 58 N. Y. 223; Burke v. Cassin, 45 Cal. 467; Marshall v. Pinkham, 52 Wis. 572.

(*i*) Town v. Stetson, 3 Daly, 53; S. C. 5 Abb. Pr. (N. S.) 218.

(*j*) Larabee v. Lewis, 25 Alb. L. J. 203.

"short cut," as applied to cigarettes;(*k*) or "cherry pectoral;"(*l*) or "iron clad" applied to boots; or "gold medal"(*m*) or "Club House," applied to gin to indicate quality.(*n*) So words commonly used in any language cannot be specially appropriated, as "schnapps," used to designate gin.(*o*) The appropriation and use for many years of the word "royal" as a trade-mark is entitled to protection;(*p*) so of "Old London Dock Gin," in connection with a certain style of bottle and label;(*q*) so of "The Heroine" stamped on the glass;(*r*) so of "Magnetic Balm" upon a manufactured medicine;(*s*) and so of "Keystone Line," acquired by many years' possession.(*t*) The exclusive right to the use of the word "Durham" recognized.(*u*) The use of a word tending to deceive the public cannot be tolerated;(*v*) and equity will not protect a person in the use of a false or deceptive trade-mark;(*w*) nor where the party is attempting to deceive the public.(*x*) A fraudulent and deceptive trade-mark is not to be protected by injunction; yet that it bears a fictitious name does not affect the owner's right where it is not used with a fraudulent intent.(*y*)

Names and devices adapted to point out the true source and origin of a manufactured article may be adopted as a trade-mark(*z*) if it is used to designate origin or ownership, but never when used to designate the article itself,(*a*) unless it may be a product of nature, such as mineral water obtained from a spring, as "congress water" and "congress spring water."(*b*) The name of a place where a particular business is carried on will not be protected from invasion;(*c*) so "Mammoth Wardrobe" as the designation of a place will not be protected.(*d*) The name of an inventor, discoverer, or manufacturer may be employed as part of a trade-mark, as "Dr. J. M. Lindsey's Improved Blood Searcher,"(*e*) "Dr. J. Blackman's Genuine Healing Balsam,"(*f*) the "Roger William Long Cloth."(*g*) A person may use his own name for a trade-mark unless it leads to deceiving the public;(*h*) but to entitle him to protection his right to its use must be exclusive, and not a name which others may employ with as much truth as he who uses it.(*i*) The mere name of a person does not form a proper subject for a trade-mark,

(*k*) Ginter v. Kinney Tobacco Co. 12 Fed. Rep. *post.*

(*l*) Ayer v. Rushton, 7 Daly, 9.

(*m*) Hecht v. Porter, 6 Pac. C. L. J. 569.

(*n*) Taylor v. Gillies, 59 N. Y. 331.

(*o*) Wolfe v. Goulard, 18 How. Pr. 64.

(*p*) Royal B. P. Co. v. Sherrill, 59 How. Pr. 17.

(*q*) Bininger v. Wattles, 28 How. Pr. 206.

(*r*) Rowley v. Houghton, 2 Brewst. 303.

(*s*) Smith v. Sixbury, 25 Hun, 232. See Connell v. Reed, 128 Mass. 477.

(*t*) Winsor v. Clyde, 9 Phila. 513.

(*u*) Blackwell v. Dibrell, 3 Hughes, 151.

(*v*) Ginter v. Kinney Tobacco Co. 12 Fed. Rep. *post.*

(*w*) Hennessy v. Wheeler, 51 How. Pr. 457; Seabury v. Grosvenor, 53 How. Pr. 192; Helmbold v. Helmbold Manuf'g Co. Id. 453; Laird v. Wilder, 9 Bush, 131.

(*x*) Palmer v Harris, 60 Pa. St. 156. See Dixon Crucible Co. v. Guggenheim, 2 Brewst. 321.

(*y*) Dale v. Smithson, 12 Abb. Pr. 237; Stewart v. Smithson, 1 Hilt. 119.

(*z*) Filley v. Fassett, 44 Mo 168. See Ferguson v. Davol Mills, 2 Brewst. 314; Dixon Crucible Co. v. Guggenheim, Id. 321.

(*a*) Fetridge v. Wells, 4 Abb. Pr. 144; Marshall v. Pinkham, 52 Wis. 572.

(*b*) Congress, etc., Spring Co. v. High Rock, etc., Spring Co. 45 N. Y. 291.

(*c*) Glen, etc., Manuf'g Co. v. Hall, 61 N. Y. 226. See Newman v. Alvord, 49 Barb. 588; Pepper v. Labrot, 8 Fed. Rep. 29.

(*d*) Gray v. Koch, 2 Mich. N. P. 119.

(*e*) Fulton v. Sellers, 4 Brewst. 42.

(*f*) Filkins v. Blackman, 13 Blatchf. 440.

(*g*) Barrows v. Knight, 6 R. I. 434.

(*h*) England v. N. Y. Publishing Co. 8 Daly, 375.

(*i*) Canal Co. v. Clark, 13 Wall. 311; Meneeley v. Meneeley, 62 N. Y. 427.

although it appears that such name, by long association with a certain line of goods, has come to be applied as a name or title to such goods.(*j*)   A manufacturer may label his goods with his own name or that of his mill, if no fraudulent purpose is intended.(*k*)   So a corporation name may be protected,(*l*) and a trade name of a firm will be protected(*m*) and may be assigned to a successor, who has the same right of protection(*n*) and the right to its exclusive use.(*o*)   The proprietary right to the name of a newspaper will be protected, (*p*) as "The American *Grocer;*"(*q*) but the mere assimulation of the name, unless clearly calculated to deceive, would not be a violation.(*r*)   Geographical names are not generally capable of specific appropriation,(*s*) as "Lackawanna Coal," "Scranton Coal," "Pittson Coal,"(*t*) "Worcestershire Sauce."(*u*)   So of the name of the town or city;(*v*) but where the name of the village has been used by a manufactory for a number of years as a trade-mark it will be protected as against new-comers.(*w*)

Although there is no property in a trade-mark as a mere abstract right, a property therein will pass by assignment or operation of law.(*x*)   Where a trade-mark is used to designate the place where and the person by whom the goods are made, the right passes to the purchaser on a transfer of the business; but the mere sale of a trade-mark, apart from the article to which it is affixed, confers no right of ownership.(*y*)   Where a firm made an assignment for the benefit of creditors of " all property and effects of every nature and description," the good-will of the business and the right to the use of the firm name and the trade-marks passed to the purchaser from the assignees.(*z*)   A trade name of a firm is property, which may be assigned to a successor, who thereby obtains the same right to protection in its use as the original firm;(*a*) but whether a trade-mark will pass under a general assignment, *quære.*(*b*)   A sale of the spring carries to the purchaser the right to the use of the trade-mark for the water of such spring.(*c*)   The transfer of wood cuts of a trade-mark for a specific purpose gives no right to the trade-mark after such purpose is accomplished;(*d*) but an absolute assignment of a trade-mark gives the the right to exclusive use.(*e*)—[ED.

(*j*) Ex parte Fairchild, 21 O. G. 789.  See Marshall v. Pinkham, 52 Wis. 572.

(*k*) Amoskeag Manuf'g Co. v. Garner, 54 How. Pr. 297; Gillott v. Esterbrook, 48 N. Y. 374; Shaver v. Shaver, 54 Iowa, 208.

(*l*) Gillott v. Esterbrook, 48 N. Y. 374.

(*m*) Carmichael v. Latimer, 11 R. I. 395.

(*n*) Howard v. Park, 21 Hun, 618; Congress, etc., Spring Co. v. High Rock, etc., Spring Co. 10 Abb. Pr. (N. S.) 348.

(*o*) Blackwell v Dibrell, 3 Hughes, 151.

(*p*) Matsell v. Flanagan, 2 Abb. Pr. (N. S.) 459; Stephens v. De Conto, 4 Abb. Pr. (N. S.) 47; Bell v. Locke, 8 Paige, 75.

(*q*) Am. Grocer v. Grocer Pub. Co. 25 Hun, 398.

(*r*) Stephens v. De Conto, 7 Robt. 343; 4 Abb. Pr. (N. S.) 47; Marshall v. Pinkham, 52 Wis. 572.

(*s*) Lea v. Wolf, 46 How. Pr. 157; Canal Co. v. Clark, 13 Wall. 311.

(*t*) Canal Co. v. Clark, 13 Wall. 311.

(*u*) Lea v. Wolf, 13 Abb. Pr. (N. S.) 391.

(*v*) Glendon Iron Co. v. Uhler, 75 Pa. St. 467.

(*w*) Newman v. Alvord, 51 N. Y. 189.

(*x*) Dixon Crucible Co. v. Guggenheim, 2 Brewst. 321.

(*y*) Witthaus v. Mattfeldt, 44 Md. 303.

(*z*) Hegeman v. Hegeman, 8 Daly, 1.

(*a*) Howard v. Park, 21 Hun, 618.

(*b*) Milliken v. Williams. 26 Hun, 24.

(*c*) Congress, etc., Spring Co. v. High Rock, etc., Co. 10 Abb. Pr. (N. S.) 348.

(*d*) Lockwood v. Bostwick, 2 Daly, 521.

(*e*) Blackwell v. Dibrell, 3 Hughes, 151.