ALBANY PERFORATED WRAPPING-PAPER CO. v. JOHN HOBERG CO.

(Circuit Court, E. D. Wisconsin. May 18, 1900.)

TRADE-MARKS—NATURE AND PURPOSE—RIGHT TO PROTECTION IN USE.

A trade-mark must denote origin, and its legitimate purpose is to distinguish the goods of the manufacturer using it from those of other manufacturers. Hence a manufacturer of a single article, like toilet paper, who uses upon his packages a large number of different names, to designate differences in quality, shape, or size, or merely to meet the whims of customers, and which tend to produce confusion, rather than certainty, as to origin, cannot be protected in the exclusive use of such names as trade-marks.

In Equity. Suit to enjoin infringement of trade-marks.

Winkler, Flanders, Smith, Bottum & Vilas, for complainant.
Erwin, Wheeler & Wheeler, for defendant.

JENKINS, Circuit Judge. The complainant filed its bill to enjoin the use by the defendant of 13 different trade-marks of which the complainant claimed to be proprietor, and used upon toilet paper which it manufactured and sold. These brands were, respectively: Sunflower, adopted in 1891; Beverwyck, adopted in 1893; Club, adopted in 1891; Clover Leaf, adopted in 1891; Pacific, adopted in 1891; Diamond, adopted in 1891; Hotel, adopted in 1886; Factory, adopted in 1886; Standard, adopted in 1886; Economy, adopted in 1886; Victor, adopted in 1893; Cabinet, adopted in 1891; A No. 1, adopted in 1891. The complainant appears to have been the first to manufacture and sell perforated toilet paper in rolls. It also made and sold it in sheets. Some of these brands were attached to the rolls, and some of them to the sheets, or the packages containing the sheets. With respect to most of the brands, they would seem, from the evidence, to have designated in some cases the quality, and in some cases the size, of the sheets; and the sale prices differed according to the quality and the size of the sheets. Thus, sheets to which the Sunflower brand was attached were 4 by 6, and the price $5 per case, while the Beverwyck brand represented a finer quality of paper, and in size was 4½ by 6½, and was sold at $7.25 a case. The Hotel brand represented the quality of paper commonly supposed to be used in hotels. I do not find that the same brand was used on different qualities and sizes of paper, with the possible exception of the Diamond brand, which appears to have been used

upon three qualities and two sizes of paper. The complainant commenced the business of manufacture and sale of toilet paper in the year 1877, its principal officer testifying that he was unable to say how many different brands were used by it,—whether 1,000, 2,000, or 5,000; but the testimony leaves no doubt that it employed a large · number of brands. Certain of these brands were originated by its officers, and a large number of other brands suggested by customers, and it placed the particular brand suggested upon the paper sold that customer; and, when requested, the name of the customer was also printed upon the package. This was done because, as the witness testified, "it is impossible to account for the whims of the trade. The trade demands many things that are quite unaccountable." "Because the trade demands a good many different styles of packages and of wrappers. We use it for that purpose, and to designate the different styles, to distinguish them one from the other." And this is done for the purpose, first, "to make an attractive looking package,—one that will command a ready sale; and the other purpose, as I have already stated, is to designate the different kinds of paper." The defendant, engaged in a like business, uses seven or eight hundred different trade-marks or brands; and it would appear that every person engaged in this trade uses a large number of brands, to the extent that there would seem to be rivalry among the different manufacturers who should be able to use the greater number of brands. I find no difficulty in holding that, with the exception of the Diamond brand, the defendant's brands designated in the bill are clear infringements upon 12 of the complainant's brands, as stated in the bill. I have as little difficulty in finding that the defense of prior appropriation, except as to the brands Pacific and Victor, is not established. At the hearing the complainant abandoned its claim to the brands Standard and A No. 1, conceding that the words of themselves denoted quality; to Pacific and Victor upon the ground of prior appropriation; and to the brand Diamond upon the ground that infringement had not been proven. I am impressed with the conviction that the 8 brands upon which the complainant relies are used to designate size or shape or quality of the paper used, although the fact that the arbitrary words are attached to packages without reference otherwise to the manufacturer lends considerable doubt to the conclusion.

The principal question which is suggested by the bill and the evidence is whether the manufacturer of a single article has the right to use, and to be protected in the use of, more than one trade-mark for that article. I find little authority upon the subject, and have given to the question much consideration. Upon principle, I think that he cannot. A trade-mark must denote origin. A trade-mark is defined by Mr. Upton to 'be the name, symbol, figure, letter, form, or device adopted and used by a manufacturer or merchant in order to designate the goods he manufactures or sells, and distinguish them from those manufactured or sold by another, to the end that they may be known in the market as his, and thus enable him to secure such profits as result from a reputation for superior skill, industry, or enterprise. Upton, Trade-Marks, p. 9, c. 1. How can that

purpose be accomplished, if a manufacturer dealing in a single article used a thousand different trade-marks to designate the article and its origin? Such use necessarily produces confusion, and fails of the single purpose of the trade-mark,—to designate with certainty the origin of the product. Certainly no manufacturer would, in regard of self-interest, indulge in such a practice; for he would thereby defeat the very purpose he sought to accomplish. This consideration has led me to the conviction that the complainant, the originator of perforated rolled toilet paper, would not do that which would blind the public mind to the originator and manufacturer of the article, and would tend to dissipate its trade. It is more probable (and the evidence, I think, sustains the conclusion) that its design was, by the various names, to distinguish between the size, shape, and quality of the paper manufactured, and that the marks were not placed thereon as indicating origin. The only authority which I have been able to find passing directly upon this question is the case of Candee v. Deere, 54 Ill. 439, 457. In the conclusion reached by the supreme court of Illinois upon this particular question, I fully concur. It is remarkable that, with respect to so simple a product as that in question, it should be found that so large a number of claimed trade-marks should be used by one manufacturer. A court of equity cannot be impressed by an appeal to protect that which produces infinite confusion. It may be that in the struggle for trade the whims of retailers must be consulted, and that rivalry between dealers to present something attractive to the public eye must exist; but courts of equity do not sit to indulge the whims of purchasers, or to protect one in creating confusion. They sit to protect and to enforce legal and equitable rights. If this bill can be maintained, the extent of the proprietorship of the complainant in the use of arbitrary names applied to the subject of toilet paper would be limited only by the imagination of its officers. The bill will be dismissed for want of equity.