## CAPEWELL HORSE NAIL CO. v. MOONEY.

### (Circuit Court, N. D. New York. January 30, 1909.)

1. TRADE-MARKS AND TRADE-NAMES (§ 4*)—MARKS SUBJECT OF OWNERSHIP—ARBITRARY DEVICE.

A check figure formed of intersecting lines, impressed on the under or beveled face of the heads of horse nails, or on pictures of such nails on packages containing the same, as an arbitrary mark to designate them as the product of a certain maker, is a legitimate trade-mark.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 8; Dec. Dig. § 4.*

Arbitrary descriptive or fictitious character of trade-marks and trade-names, see note to Searle & Hereth Co. v. Warner, 50 C. C. A. 323.]

2. TRADE-MARKS AND TRADE-NAMES (§ 3*) — ORIGIN AND ADOPTION OF MARKS.

If a manufacturer had originally two or more purposes in adopting a particular mark for his goods, as, for instance, to indicate the quality and also the origin, and also to ornament the article, and the goods bearing this particular mark, and by reason thereof, had come to be known as the goods of that manufacturer, irrespective of grade or quality, there is no reason why he may not adopt such mark as a general trade-mark to indicate origin solely, no other person having adopted or used it.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 4–7; Dec. Dig. § 3.*]

3. TRADE-MARKS AND TRADE-NAMES (§ 3*)—ORIGIN AND ADOPTION OF MARK—PURPOSE OF USE.

Where the primary purpose of a manufacturer in adopting an arbitrary mark as a trade-mark was to indicate and identify the origin of the goods, he is not debarred from protection because it has incidentally come to indicate also the quality of the goods.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 4–7; Dec. Dig. § 3.*]

4. TRADE-MARKS AND TRADE-NAMES (§ 26*)—EXTENT AND MANNER OF USE.

Where a mark adopted by a manufacturer as a trade-mark has come to indicate and identify goods as of his make, it is immaterial that he did not advertise nor state on the packages the fact that such mark was claimed as a trade-mark.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 29; Dec. Dig. § 26.*]

5. TRADE-MARKS AND TRADE-NAMES (§ 28*)—EXTENT AND MANNER OF USE.

A trade-mark for horseshoe nails is not invalid because the owner does not use it on all grades of such nails made by him, but he may have different trade-marks for different grades where the primary purpose of each is to indicate origin and not quality.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 31; Dec. Dig. § 28.*]

6. TRADE-MARKS AND TRADE-NAMES (§ 25½*)—EXTENT AND MANNER OF USE—USE OF DIFFERENT TRADE-MARKS.

A manufacturer of horseshoe nails of different grades and sizes which are put up and sold in packages and boxes and also sold and used loosely may adopt and use, and be protected in using, at least two trade-marks, the primary purpose of which is to indicate origin, for the same grade of nails, one to be imprinted on the nail itself and the other on the packages and boxes containing such nails; and this is so even if such manufacturer has other trade-marks primarily adopted to indicate the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

same origin, but which incidentally indicate grade, and which he uses on other grades of his manufacture.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 25½.*]

7. TRADE-MARKS AND TRADE-NAMES (§ 4*)—MODE OF AFFIXING MARK—ORNA-MENTAL DEVICE.

The fact that a mark imprinted on a horseshoe nail may add to its appearance does not prevent such mark from being appropriated as a trade-mark.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 4.*]

8. TRADE-MARKS AND TRADE-NAMES (§ 27*) — NAMES — MODE OF AFFIXING MARK.

The fact that a trade-mark for a horseshoe nail is cut or stamped into the nail itself does not affect its validity.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 30; Dec. Dig. § 27.*]

9. TRADE-MARKS AND TRADE-NAMES (§ 43*)—REGISTRATION—RIGHT TO REGIS-TRATION.

A statement made in an application for registration of a trade-mark that the applicant's use of such mark has been exclusive is not false, so as to deprive him of the right of registration or estop him from maintaining an action to protect his right because it may appear that some one else had previously used such mark in violation of his exclusive right.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 43.*]

10. TRADE-MARKS AND TRADE-NAMES (§ 4*)—INFRINGEMENT—HORSE NAILS.

A check figure, formed of intersecting lines impressed on the beveled face beneath the heads of horseshoe nails, *held* a valid trade-mark and infringed.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 8; Dec. Dig. § 4.*]

In Equity. Suit to restrain alleged unlawful infringement of trade-mark and alleged unfair competition in trade.

Edmund Wetmore and Oscar W. Jeffery, for complainant.
Robert W. Hardie and Charles A. Munn, for defendant.

RAY, District Judge. The complainant, Capewell Horse Nail Company, is a Connecticut corporation, and has its factory and main and principal place of business at Hartford, in that state. The defendant, Walworth M. Mooney, is a citizen and resident of the state of New York, and has his factory and place of business at Ausable Chasm, in said state.

The parties are competitors in the business of manufacturing and selling horseshoe nails. The complainant company has been engaged in the business since 1881, and is one of the largest manufacturers and sellers of such nails in the United States. That it manufactures and sells a high grade of nails at a high price is shown and not seriously questioned. The nail in question, and referred to as the "Capewell" nail, the highest or best grade nail made by it, constitutes about 75 per cent. of its entire output. The complainant's alleged trade-mark has been used by it in marking and designating its nails since 1892, and consists of a pattern of small but uniform checks stamped on the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

under or beveled face of the head of each nail. It is stamped on one face only, viz., the front beveled face, and covers it. That it is a distinguishing mark cannot be questioned. This alleged trade-mark was registered in the Patent Office under Act Feb. 20, 1905, c. 592, 33 Stat. 724 (U. S. Comp. St. Supp. 1907, p. 1008), on the 9th day of October, 1906, No. 56,605. In the statement filed June 5, 1905, it was described as consisting of "a check formed of intersecting lines on the under or beveled face of the nail heads." In a communication of September 2, 1905, the Patent Office so recognized the claim. The original drawing showed, not only the check-mark claimed on the nail in its proper place, the beveled face of the head, but the entire nail. Pursuant to an order of the Patent Office, the applicant filed a new drawing showing only the intersecting lines forming the check-mark; that is, the check-mark independently of the nail. October 23, 1905, the Patent Office reversed its holding, and notified the applicant that the original illustration of the mark claimed was the correct one, and that a new drawing should be filed so as to show the mark claimed on the beveled face of the head of the nail according to the description in the original statement. This direction was complied with. However, pending the application, the practice in the office was so changed as to omit descriptions of trade-marks in applications therefor, and required applicant to state that he has "adopted the trade-mark shown in the drawing." This rule was not applied in this case, and the whole proceeding and file wrapper show that the "trade-mark" applied for, described, and registered was the "check-mark" and not the "nail with the check-mark" thereon. The nail was retained, under the ruling of the department made at the time, to show the location of the trade-mark thereon, and not as a part of the trade-mark. The statement reads:-

"To All Whom It may Concern:

"Be it known that The Capewell Horse Nail Company, a corporation duly organized under the laws of the state of Connecticut, and located in the city of Hartford, county of Hartford, in said state, and doing business at Nos. 57 to 69 Charter Oak avenue and 36 to 84 Governor street, in said city of Hartford, has adopted for its use the trade-mark shown in the accompanying drawing.

"This trade-mark has been continuously used in the business of said corporation since the latter part of 1892 or the early part of 1893.

"The class of merchandise to which the trade-mark is appropriated is class 13, metal manufactures not otherwise classified, and the particular description of goods comprised in said class upon which said trade-mark is used is horse-nails.

"This trade-mark is impressed on the under side or beveled face of the heads of the nails and on the packages and boxes containing the nails.

"The Capewell Horse Nail Company,

"By George C. F. Williams, Sec'y."

I do not think that under the proofs in this case and the practice of the Patent Office as it was at the time of the pendency of this application, especially the filing thereof, the defendant's contention can be sustained that the trade-mark claimed, allowed, and registered is the nail with the check-marks thereon. To hold otherwise would do violence to the plain intent and purpose of the applicant as shown by the file wrapper. In the original statement it said:

167 F.—37

"The trade-mark consists of a check formed of intersecting lines on the under or beveled face of the nail head. This trade-mark has been continuously used in our business since the latter part of 1892 or the early part of 1893."

The letter of the Commissioner dated September 2, 1905, said:

"The mark claimed consists of a check formed of intersecting lines on the under or beveled face of the nail head."

This was the statement also of D. L. Pittman, acting examiner. After the applicant had filed his new drawing showing simply the check-mark, the same examiner said, and this was communicated to the applicant October 23, 1905:

"Applicant has filed a new drawing, and it does not show the trade-mark as described or as used. The original illustration of the mark is the correct one, and a new drawing should be filed. [Signed] D. L. Pittman, Acting Examiner."

In view of his prior description of what the trade-mark claimed actually was, it is impossible to say that this examiner was leading the applicant into a trap and inducing him to claim and register "a horseshoe nail with the check formed of intersecting lines thereon" as his trade-mark. The applicant had not made that claim, and, to have so broadened it, would have made the accompanying declaration under oath false. The trade-mark used had been, not a nail with the check thereon, but the check alone. This "trade-mark," the check, was used on a horseshoe nail or on the package containing the nails. It may be that under the practice subsequently adopted, or adopted during the pendency of this application, the drawing filed was the trade-mark allowed and registered in subsequent cases, but this practice was not applied to this case.

The defendant insists that this check-mark was not the subject of a valid trade-mark at common law or under the statute; that it was in common use in the manufacture of various useful articles, and the common property of all the people, and that it could not be appropriated by this claimant as a trade-mark for horseshoe nails. It must be conceded that similar checks, composed of or formed by lines crossing each other at right angles, or diagonally, and cut into the metal, had been in use for years to form gripping surfaces, as in forceps, tweezers, vises, etc., where they are cut on the interior surfaces of the jaws of the gripping devices. They had also been used on the exterior surfaces of the handles of various tools to prevent the slipping of the hand of the workman when grasping the tool.

I do not think the mere fact that the general design of this alleged trade-mark is composed or made up of a form of marks found elsewhere in general use for purposes of utility deprived the complainant company of the right to adopt this particular check-mark, of this particular form, used in this particular place on the horseshoe nail itself, or representations of such nail, as its trade-mark to designate its goods as those of its make or manufacture.

In Hutchinson v. Blumberg (C. C.) 51 Fed. 829, 830, the symbol of a star was held a valid trade-mark. In that case the word "star" was used in connection with the symbol, but I cannot see that this was ma-

terial. Stars—that is, figures and symbols of stars, and paintings and signs with stars painted and engraved thereon, etc.—have been used for more than a hundred years both for ornamentation and utility, and, so far as I know, any one had and has the right to use the symbol or cut of a star for such purposes, but it seems that it could be and was appropriated as a valid trade-mark. In Johnson v. Brunor (C. C.) 107 Fed. 466, Judge Lacombe restrained the infringement of a trade-mark consisting of a red cross. Now crosses have been used by the general public both for ornamentation and utility for generations.

In Hier v. Abrahams, 82 N. Y. 519, 523, 37 Am. Rep. 589, the court said:

"Trade-marks are of two kinds. They may consist of pictures or symbols or a peculiar form and fashion of label, or simply of a word or words, which, in whatever form printed or represented, continue to be the distinguishing mark of the manufacturer who has appropriated it or them, and the name by which his products are known and dealt in."

In Popham v. Cole, 66 N. Y. 69, 23 Am. Rep. 22, the trade-mark consisted of the figure of a hog, with the name of the manufacturer and the words "prime leaf lard." The court, per Rapallo, J., held that the words, being descriptive merely, could not be appropriated as a trade-mark. The court also held that there was such a distinction between the fat, plump, well-conditioned hog of complainant's trade-mark and the lean, scrawny, ill-conditioned wild boar of defendants' device that there was no infringement. The court took occasion, however, to say, in speaking of the sign or symbol of the hog:

"The sign or symbol may be employed with equal truth in respect to any parts of the dead swine or the products of that animal put up for sale, and no one dealer has a greater right than any other to appropriate it to his own purposes. A serious question might be made as to the right of the plaintiff to appropriate to his exclusive use as a trade-mark the picture of the animal from which not only his lard but the lard of all other dealers and manufacturers of lard is derived, especially when the same emblem or symbol has been used by dealers in lard and other products of the slaughtered hog indiscriminately as they have had occasion. But, passing this question, there are other difficulties in the plaintiff's case which are insuperable."

In James Trade-Mark, 33 Ch. D. 392, the judge said:

"Why a pig should not be, according to English law, a distinctive mark for lard, or something made out of a pig, I do not know. Suppose you tanned pig skin into leather, I do not know why a pig should not be a good trade-mark for tanned pig's hide."

In Harrison v. Taylor, 11 Jur. N. S. 408, 12 L. T. (N. S.) 339, it was held that the figure of an ox on mustard, which from the figure had come to be called "Ox-Mustard," was a good trade-mark. In Orr-Ewing v. Johnston, 13 Ch. D. 434, it was held that the figures of two elephants used on a label for yarn exported to India, and which had come to be known as "Elephant Yarn," was entitled to protection as a valid trade-mark.

There are several cases holding that numerals arbitrarily selected may become the subject of a valid trade-mark. Humphreys H. M. Co. v. Hilton (C. C.) 60 Fed. 756; Dawes et al., 1 O. G. 27; Gillott v. Esterbrook et al., 48 N. Y. 374, 8 Am. Rep. 553. In the last case cited

the trade-mark consisted of the figures "303." Figures, all the numerals, are the common property of all, and all have the right to use them generally in any sort of combination. It cannot be doubted that the general public had the right to use the figures "303" for any useful purpose, except to designate their own goods or goods of their own manufacture after the plaintiff had appropriated those numerals as his trade-mark. I do not see that the complainant here was debarred from appropriating this peculiar check-mark as his trade-mark for the reason that similar check-marks and the general use thereof for other purposes was a right common to the general public. The general public has the right, as stated, to use the numerals and all combinations thereof; to use the pictures and figures of elephants and the figures and pictures of oxen, etc.; but if one firm or person has appropriated such pictures or symbols to his exclusive use, as his trade-mark, and the general public has permitted him to do so until the picture, symbol, or combination of numerals so selected by him has come to distinguish the goods of his manufacture from all others of the kind, I cannot see why he is not entitled to protection. So here, while the general public has the right to use this check-mark to form a gripping surface to hold the article to be gripped or to prevent the hand of the user of the tool from slipping thereon, and perhaps for other purposes, I do not see that this fact prevented the complainant from appropriating it as a trade-mark. All the world may use the check-mark except as a trade-mark. This would reduce the proposition here, on this branch of the case, to the question whether the defendant used the check-mark, in manufacturing horseshoe nails, as a gripping surface, or for the purpose of imitating the complainant's mark and manufacture so as to pass off his nails as those of the complainant company.

That question was argued before this court at great length and with great ability. The record contains a large amount of evidence on that subject. The defendant contends that, in manufacturing the nail, experience had proved that it was necessary to harden and toughen it next the head as well as to roll it into proper shape; that in passing the nail between the rollers at a certain stage of manufacture it was found that the nail was liable to jump or slip from its proper position, and that this jumping or slipping would produce a defective nail; that it was therefore necessary at this stage of manufacture to provide on the roller a gripping or holding surface which would prevent the nail from jumping or slipping between the rollers. The complainant produced in court a section of the machine which performs this operation of impressing what it contends is its trade-mark on the head of the nail. This section of machinery also showed to the court the manner in which the nail passes between the rollers. It would not be profitable to discuss the evidence bearing on this question pro and con, or to enter upon a description of the machinery. I have studied the evidence as well as the machine produced. The defendant contends that the machine produced does not fairly and fully show the operation of defendant's machine used for the manufacture of horseshoe nails. I have not placed great reliance on the machine exhibited, except as it illustrates the way in which nails must pass between the

rollers. From the evidence contained in the voluminous records of the parties I have arrived at the conclusion, and am satisfied that it was not necessary for the defendant to use the check-mark of the complainant as a gripping or holding surface in the manufacture of horseshoe nails, or, rather, to use rollers having a gripping surface thereon which would produce the complainant's check-mark on the nail. The defendant has used rollers which, in gripping the nail at this stage of manufacture, imprint thereon the exact duplication of the complainant's trade mark. It was unnecessary to do this, even if it was necessary to have a gripping surface on the roller to prevent the slipping or jumping of the nail as it passed between the rollers. Some other of the many forms of gripping surfaces could have been used. It is significant that a gripping surface was used which produces upon the nail an exact copy of complainant's trade-mark. The complainant had made its nail with this distinguishing mark thereon for many years before the defendant claims to have discovered that a gripping surface was necessary. The complainant had built up its trade in horseshoe nails on this particular kind of nail with this check-mark thereon, which had come to be well known among all dealers and users as the distinguishing mark of the complainant's product. I am satisfied from the evidence as a whole that the nail in passing between the rollers at this stage of manufacture neither jumps nor slips, and that the use of the gripping surface, other than the rollers themselves, is entirely unnecessary, and that the defendant adopted the gripping surface which produces on the nail the check-mark in question for the purpose of producing a nail which would so closely imitate or simulate complainant's nail that to the eye of the observer the one could not be distinguished from the other, and for the purpose of selling his product on the market as nails of complainant's manufacture. If it was necessary to have a gripping surface on the roller, it was not necessary to use the only one of the many which would produce on the nail the exact counterpart of complainant's distinguishing mark, which had come to be well known in the trade and among manufacturers and dealers in and users of horseshoe nails. I therefore must find that the production of this check-mark on defendant's nails is not a necessary incident of manufacture.

I do not think the complainant ever adopted or used a roller that would produce this check-mark as an incident of manufacture, for the purpose of gripping or holding the nail in position while passing through or between the rollers. The evidence establishes to my satisfaction that the original or primary design and purpose was to impress upon the nail itself, at the place designated and mentioned, a mark of peculiar form and design, which should distinguish a certain class or certain classes of nails manufactured by complainant from those of all other manufacturers.

Hesseltine's "The Law of Trade-Marks and Unfair Trade," says (page 6):

"A trade-mark is an arbitrary sign affixed by a proprietor to his goods with the intention of designating their origin by a use thereon: (1) An arbitrary sign is a word, a combination of words, letters, a name, a number, a figure or

symbol, not necessarily disclosing on its face the origin of the goods, affording by association a ready means of recognition of their origin."

In Columbia Mill Co. v. Alcorn, 150 U. S. 460, 14 Sup. Ct. 151, 37 L. Ed. 1144, the court said, amongst other things:

"That to acquire the right to the exclusive use to a name, device, or symbol, as a trade-mark, it must appear that it was adopted for the purpose of identifying the origin or ownership of the article to which it is attached, or that such trade-mark must point distinctively, either by itself or by association, to the origin, manufacture, or ownership of the article on which it is stamped. It must be designed, as its primary object and purpose, to indicate the owner or producer of the commodity, and to distinguish it from like articles manufactured by others. That if the device, mark, or symbol was adopted or placed upon the article for the purpose of identifying its class, grade, style, or quality, or for any purpose other than a reference to or indication of its ownership, it cannot be sustained as a valid trade-mark. That the exclusive right to the use of the mark or device claimed as a trade-mark is founded on priority of appropriation; that is to say, the claimant of the trade-mark must have been the first to use or employ the same on like articles of production."

These principles are sustained in numerous adjudicated cases. However, it is to be kept in mind that while the primary purpose of the adoption of the particular symbol, device, or mark must have been to indicate and identify the origin or ownership of the article to which it is attached, it is all-sufficient if the particular mark, or symbol, or device used by a manufacturer has come to point distinctively, either by itself or by association with the goods of that particular manufacturer to which attached, to the origin and manufacture of the article on which stamped, and the manufacturer of those particular goods has thereupon adopted it as his trade-mark, no other person having adopted or used it to designate his goods. If the manufacturer had originally two or more purposes or objects in adopting the particular mark, as, for instance, to indicate the quality and also the origin, and also to ornament the article, the idea being that with this particular mark the article would be more attractive when exposed for sale, and the goods of this manufacturer, bearing this particular mark, and by reason thereof, had come to be known as the goods or manufacture of that particular manufacturer, irrespective of grade or quality, and he thereupon adopted such mark, symbol, or device as his trade-mark to indicate origin solely, no other person or persons having adopted or used it, I do not see that such mark did not on such adoption become his valid trade-mark, or that the trade-mark is not valid as such. There is a difference between the original use of the mark, or symbol, or device, and its adoption as a trade-mark, and the primary purpose of its adoption as a trade-mark. Within the language of the cases, if the trade-mark points distinctively by itself, not being merely descriptive or indicative of quality, or by association to the origin, manufacture or ownership of the article on which stamped, and on which placed by the manufacturer, or it was adopted by him for the purpose of identifying the origin or ownership of such article, and it is a mark which may be lawfully so appropriated, then, in either event, it is a lawful trade-mark. "The primary object of a trade-mark is to indicate origin, and if the primary object be to in-

dicate quality, then the exclusive right to use cannot be acquired." Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 537, 11 Sup. Ct. 396, 34 L. Ed. 997.

The check-mark in question is not in any sense descriptive of a horseshoe nail. It does not describe its qualities, ingredients, characteristics, or uses. A horseshoe nail would. So it was held that the picture or representation of a book was not a valid trade-mark. Merriam v. Famous Shoe & Clothing Co. (C. C.) 47 Fed. 411, 413, 414. In Lawrence Manufacturing Co. v. Tennessee Manufacturing Co., 138 U. S. 537, 546, 11 Sup. Ct. 396, 400, 34 L. Ed. 997, Mr. Chief Justice Fuller said:

"The trade-mark must therefore be distinctive in its original signification, pointing to the origin of the article, or it must have become such by association."

This check-mark of the complainant is not distinctive in its original signification. It, of itself, does not point to the Capewell Company, or any company or corporation, or to any particular article of manufacture. By association with the horseshoe nails of the Capewell Horse Nail Company, this check-mark became distinctive in its signification, and points unerringly to the origin of the horseshoe nails to which it is applied. It came to mean, when imprinted on a horseshoe nail, or a package containing such nails, "made by Capewell Horse Nail Company." It meant no others, for it was not used by any other person or company who manufactured nails. Capewell's nails were of a high grade and known so to be, hence incidentally this mark indicated a first quality of nail. But this fact does not debar the complainant from protection. Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 537, 547, 548, 11 Sup. Ct. 396, 400, 34 L. Ed. 997. The court said:

"Nothing is better settled than that an exclusive right to the use of words letters, or symbols, to indicate merely the quality of the goods to which they are affixed, cannot be acquired. And while, if the primary object of the mark be to indicate origin or ownership, the mere fact that the article has obtained such a wide sale that it has also become indicative of quality is not of itself sufficient to debar the owner from protection, and make it the common property of the trade (Burton v. Stratton [C. C.] 12 Fed. 696), yet if the device or symbol was not adopted for the purpose of indicating origin, manufacture, or ownership, but was placed upon the article to denote class, grade, style, or quality, it cannot be upheld as technically a trade-mark."

In this case, under the evidence, it is a question of fact whether or not the primary purpose of the adoption of this check-mark as a trade-mark was to indicate and identify the origin, the particular manufacturer of these nails, or to indicate quality, or to ornament the nails merely.

In Lawrence Mfg. Co. v. Tennessee Mfg. Co., supra, the alleged trade-mark consisted of the letters "L. L." used on sheetings. There was evidence that these letters were adopted and used by complainant to indicate quality and weight, and that they were and had been used generally in that business and trade to indicate quality, form, and weight. The court so held the facts to be (pages 541, 545, of 138 U. S., page 400 of 11 Sup. Ct. [34 L. Ed. 997]), and decided, not that the letters "L. L." may not be the subject of a valid trade-mark,

but, first, that the complainant did not 'adopt them primarily to show' the origin or ownership, and, second, that in that business those let-. ters could not be appropriated by any one as a valid trade-mark, inasmuch as they indicated quality, form, and weight to all and by whomsoever used when applied to sheetings, and that for such purpose in that business all had the right to use them; that they could not be appropriated exclusively by any one; and that, as the mark, sign, or symbol was one which, from the nature of the fact it was used to signify, others might employ with equal truth, others in the same business had an equal right to use it for the same purpose.

I think the evidence ample and convincing that the complainant not only adopted this peculiar check-mark, covering as it does the under or beveled side or face of the head of the nail, as, a distinguishing mark, but that it did it to indicate the origin and manufacture of the nail, and that this was its main and primary object. It is also shown by ample evidence that this nail with this mark became known to the public as the principal and leading nail made by the Capewell Horse Nail Company. Horseshoe nails bearing this mark on the head came to be generally and universally known as nails made by that company. Dealers and users called for them and demanded them, and received and used them, as the nail made by that company. Nails bearing this mark were associated in the public mind with those of complainant's manufacture. In my judgment it is not pertinent to inquire why the complainant did not call or advertise these nails, bearing this mark, "Check-Mark Nails," or "Check-Mark," or by some other name, or why it did not print these or similar words on the package containing them. If the complainant adopted this check-mark of this shape, the same shape and dimensions of the beveled face of the nail, as its trade-mark to indicate and identify the origin of the nail, and placed it upon all its nails of that grade and kind, and all its packages containing them, and placed them, bearing this mark, so adopted, on the market, and, because of this mark, these nails became associated in the public mind with the Capewell Horse Nail Company as the sole maker thereof, and the public relied on the mark as the distinguishing mark of the Capewell Horse Nail Company for its nails, or nails of its manufacture, so that when it called for nails of this company it identified their genuineness by this mark and relied thereon, it seems to me that it is entirely immaterial that the complainant did not impress on each nail or each package or carton the words "This check mark is our trademark," or advertise the fact that it had adopted the check-mark as its trade-mark. It is true that such a notice would have given notice to all who read it that the check-mark was claimed as a trade-mark, but I know of no law which requires a person to advertise his trademark, or to put a notice on it or on the goods on which it is found stating that the trade-mark imprinted or attached is a trade-mark. Of course, when it is denied that a person has adopted or claimed a certain mark as his trade-mark, an old written or printed notice that he had adopted and was claiming the mark as his trade-mark might be potent and convincing evidence that the claim had been in fact made. To my mind, evidence that a person did not do something which, how-

ever wise as a precautionary measure, the law did not require him to do, is not evidence that he did not do what he claims to have done and which the law required him to do, unless it appears that the act not done would probably and naturally precede, accompany, or follow the doing of the act in dispute. But here, at best, there is a mere absence of direct evidence on the subject the one way or the other, and complainant shows a destruction of all its old prints, etc.

The complainant now puts in evidence acts and one notice to the trade, thousands of which were sent out, showing that it did make and claim and present to the public this check-mark as the distinguishing mark of its nail, as the distinguishing mark of nails of its manufacture. That circular reads as follows:

"We show here a cut of the 'Capewell' nails. Nails which do not have this check on the head are not 'Capewell' nails. Some other nails have been made with an imitation of this check, but the imitation is so poor the check being rough and indistinct, that it is unlikely that such bogus nails will deceive any one."

In addition, it appears that complainant had and has over 100 salesmen who carry pocket cases for exhibiting the nails, each bearing the name "Capewell Horse Nail Co.," and each nail in this case has the check-mark thereon. This shows that the complainant company was exhibiting and selling these nails bearing the check-mark as "Capewell" nails. This was their distinguishing name, and it is immaterial, as stated, that this name did not in and of itself suggest the idea of a check-mark. It is all-sufficient that the check-mark read to all dealers and users and the public generally "Capewell" nails.

And I do not think it was necessary that complainant should use its trade-mark, to make it valid as such, on all horseshoe nails of every grade and variety manufactured and sold by it. The complainant makes and sells at least four grades or varieties of horseshoe nails. It applies the check-mark to its first and second grade and Black Prince nails only. This check-mark, therefore, indicates to the public not only origin, but first or second or lowest grade nails of that origin. The complainant has a mark known as "Alligator" for its third grade of nails, and another, known as "Black Prince," for its lowest grade nails. Speaking of merchandise or of manufactured articles generally, all horseshoe nails belong to a class known as "nails." Horseshoe nails are not heeling nails for ladies' and gentlemen's footwear, neither are they nails for fastening shingles on a building, known as "shingle nails," nor are they carpenter's nails for fastening boards on a building. Horseshoe nails are a class of nails within the class of manufactured articles known as "nails." If a manufacturer were making all kinds of nails, it is clear that he might have a trade-mark for each class of that class of manufactured articles, as, for instance, one trade-mark for his horseshoe nails, another for his shingle nails, and another for his common boarding nails. Can the complainant have different trade-marks for the different classes or grades of its horseshoe nails? I think it can.

Paul on Trade-Marks, § 61, pp. 105, 106, says:

"It is settled by competent authority that a manufacturer or dealer may appropriate different trade-marks for different grades of goods of the same

general kind, or different species of goods of the same genus. Each case is to be decided by considering the primary function of the mark adopted. If the primary function is to denote origin or ownership, and the mark is distinctive, it is a valid trade-mark. If the primary function is to indicate grade or quality, the mark is invalid for the purpose of a trade-mark."

In American L. B. Co. v. Anthony, 15 R. I. 338, 339, 5 Atl. 626, 627, 2 Am. St. Rep. 898, the court said:

"Within limits which are well defined, a combination of letters or figures, arranged for convenience or to attract attention, may serve the purpose of a trade-mark, as well as a device invented or arbitrarily selected. So a person may have different symbols for different grades of goods, which, in the same way, will indicate both quality and origin with respect to the goods so marked.

"A manufacturer may adopt such symbols, not simply to mark a style or quality, but his style and his quality as well. He is entitled to have his style and his quality protected from misrepresentation, and to have the benefit of any favorable reputation they may have have gained."

In Menendez v. Holt, 128 U. S. 514, 520, 9 Sup. Ct. 143, 144, 32, L. Ed. 526, the court held:

"They used the words 'La Favorita' to designate flour selected by them, in the exercise of their best judgment, as equal to a certain standard. The brand did not indicate by whom the flour was manufactured, but it did indicate the origin of its selection and classification. It was equivalent to the signature of Holt & Co. to a certificate that the flour was the genuine article which had been determined by them to possess a certain degree of excellence. It did not, of course, in itself, indicate quality, for it was merely a fancy name and in a foreign language, but it evidenced, that the skill, knowledge, and judgment of Holt & Co. had been exercised in ascertaining that the particular flour so marked was possessed of a merit rendered definite by their examination and of a uniformity rendered certain by their selection. The case clearly does not fall within the rule announced in Manufacturing Co. v. Trainer, 101 U. S. 51, 55, 25 L. Ed. 993, that 'letters or figures which, by the custom of traders, or the declaration of the manufacturer of the goods to which they are attached, are only used to denote quality, are incapable of exclusive appropriation, but are open to use by any one, like the adjectives of the language'; or in Raggett v. Findlater, L. R. 17, Eq. 29, where an injunction to restrain the use upon a trade label of the term 'Nourishing Stout' was refused on the obvious ground that 'nourishing' was a mere English word denoting quality. And the fact that flour so marked acquired an extensive sale, because the public had discovered that it might be relied on as of a uniformly meritorious quality, demonstrates that the brand deserves protection rather than that it should be debarred therefrom, on the ground, as argued, of being indicative of quality only. Burton v. Stratton (C. C.) 12 Fed. 696; Godillot v. Harris, 81 N. Y. 263; Ransome v. Graham, 51 L. J. (N. S.) Ch. 897."

It is immaterial that the mark indicates grade as well as origin, and is also ornamental, if the primary purpose of adoption and use was to indicate origin. This is the doctrine of all the well-considered cases. And it is not necessary that the mark adopted shall have been an original conception or an original design. Its use as a trade-mark, however, must have been original with the one claiming it. McLean v. Fleming, 96 U. S. 245, 254, 24 L. Ed. 828, where it is said:

"Words or devices, or even a name in certain cases, may be adopted as trade-marks which are not the original invention of the party who appropriates the same to that use; and courts of equity will protect the proprietor against any fraudulent use or imitation of the device by other dealers or manufacturers. Property in the use of a trade-mark, however, bears very

little analogy to that which exists in copyrights or in patents for new inventions or discoveries, as they are not required to be new, and may not involve the least invention or skill in their discovery or application. Phrases, or even words in common use, may be adopted for the purpose, if, at the time of their adoption, they were not employed by another to designate the same or similar articles of production or sale. Stamps or trade-marks of the kind are employed to point out the origin, ownership, or place of manufacture or sale of the article to which it is affixed, or to give notice to the public who is the producer, or where it may be purchased. Canal Company v. Clark, 13 Wall. 311, 20 L. Ed. 581.

"Subject to the qualification before explained, a trade-mark may consist of a name, symbol, figure, letter, form, or device, if adopted and used by a manufacturer or merchant in order to designate the goods he manufactures or sells, to distinguish the same from those manufactured or sold by another, to the end that the goods may be known in the market as his, and to enable him to secure such profits as result from his reputation for skill, industry, and fidelity. Upton. Trade-Marks, 9; Taylor v. Carpenter, 2 Sandf. Ch. (N. Y.) 603; Coddington, Dig. 9."

I find in the record six different trade-marks registered by the complainant company, viz.: No. 67,010, registered January 14, 1908, consisting of parallel horizontal lines, seven in number on the beveled front face of the head of the nail. No. 54,637, registered June 26, 1906, consisting of the representation of an alligator displayed on the blades of the nails, and on the packages containing the nails and the boxes containing the packages. No. 50,450, registered March 20, 1906, consisting of the monogram "C. H. N. Co.," formed of a horseshoe and nails, stamped or printed upon the packages containing the goods and the boxes containing the packages. This was first registered March 1, 1904, as No 43,190. No. 48,113, registered December 12, 1905, and consisting of the words "Black Prince" in large letters, printed or stamped on the packages containing the goods and the boxes containing the packages. This was first registered March 1, 1904, as No. 42,191. No 51,221, registered April 10, 1906, and consisting of the word "Capewell." This was applied to the packages containing the goods and the boxes containing the packages. No. 43,814, registered December 6, 1904, consisting of the fac-simile signature "Capewell" in the handwriting of Geo. J. Capewell, the vice president and superintendent of the complainant corporation. Also the one in question here and before described. All are for horseshoe nails. The two for the surname "Capewell" are clearly invalid as trade-marks. Only three of these marks are applied to the nails themselves, viz., the parallel lines, the alligator, and the check-mark. No two of these marks are applied to the nail of the same grade of nails. While the check-mark is applied to the nail itself, and is also shown on the representation of nails forming the monogram mark above mentioned, the monogram trade-mark is applied to the packages containing these nails and to the boxes containing the packages, but not to the nails themselves. It results that the complainant, as to its first and second grade nails, uses to denote origin one trade-mark on the nail itself, which is not seen when sold in packages, and another on the packages containing the nails and the boxes containing the packages. It follows that the complainant has doubly guarded itself as to these nails. The monogram indicating origin says this package or box contains nails

manufactured by the Capewell Horse Nail Company and it is unnec-
essary to open the package. When the box and package therein con-
tained are opened, the nails therein contained are found to bear the
second trade-mark, indicating the same origin or manufacture. If
packages bearing the one mark are destroyed or the nails are taken
from the package and used or sold loosely, they bear the trade-mark
imprinted on the nails themselves, and there is no chance for imposi-
tion on the user or the one on whose horse the nails are to be used.
If complainant has the right to adopt these trade-marks to indicate
the origin of the goods manufactured by it and to register them, I can-
not see that it loses the right to use the one on the nail by using the
other on the boxes and packages, or vice versa. I find nothing in the
statute that indicates a manufacturer cannot adopt and register as
many trade-marks as he pleases to indicate the goods of his make.
The trend of the authorities is that he may. The argument in opposi-
tion to this view is that it would tend to confusion. I cannot see that
such result would follow. If the trade-mark adopted and registered
indicates origin or ownership, that fact ends the matter, and I do not
see that confusion arises in the minds of dealers and users for the
reason the manufacturer indicates the same origin or ownership by
two marks or a dozen marks, provided they all indicate the same
origin or ownership. Clearly a dozen notices in express words on the
same package or article stating the same origin or ownership will not
produce confusion or uncertainty if the language be clear, even if word-
ed differently. As decided in Albany Perforated-Paper Co. v. John
Hoberg Co. (C. C.) 102 Fed. 157, the use of some thirteen different
names on packages to designate difference in quality and size of sheets
of an article such as toilet paper put up in rolls indicates strongly
and conclusively that such use of such names was adopted to indicate
size and quality, and not origin or ownership, and, such being the
facts, such names could not be claimed as trade-marks. The evidence
as to the purpose of the use of the names was:

"This was done because, as the witness testified: 'It is impossible to ac-
count for the whims of the trade. The trade demands many things that are
quite unaccountable. * * * Because the trade demands a good many
different styles of packages and of wrappers. We use it for that purpose,
and to designate the different styles, to distinguish them one from the other.'
And this is done for the purpose: First, 'to make an attractive looking pack-
age—one that will command a ready sale; and the other purpose, as I have
already stated, is to designate the different kinds of paper.'"

What was said on the subject of the manufacturer of a single ar-
ticle having the right to use and be protected in the use of more than
one trade-mark for such article was entirely obiter, as the court found
there was no trade-mark for the reasons first stated. I hold that a
manufacturer of horseshoe nails which are of different grades and
sizes and are put up and sold in packages and boxes, and also sold
and used loosely, may adopt and use, and be protected in using, at
least two trade-marks, the primary purpose of which is to indicate
origin, for the same grade of such nails, one to be imprinted on the
nail itself and the other on the packages and boxes containing such
nails, and that this is so even if such manufacturer has other trade-

marks primarily adopted to indicate the same origin, but which incidentally indicate grade, and which he uses on other grades of horseshoe nails of his manufacture.

I find nothing to the contrary in Candee Swan & Co. v. Deere & Co., 54 Ill. 439, 5 Am. Rep. 125. The fact that the complainant has registered the surname "Capewell" and puts that name on its boxes and packages does not debar it from using its valid trade-mark on the same boxes and packages and its other valid trade-mark on the nails contained therein. The check-mark is now found on the "Black Prince" grade of complainant's nails, imprinted on the nails themselves, and the words "Black Prince," with the figure of a man in armor on horseback, are found on the packages, or boxes, or both, containing them. As the check-mark is found on three grades of complainant's nails, I do not see how it can be claimed that its primary use is to indicate grade or quality instead of origin. "Capewell" may indicate first or second grade; "Alligator" may indicate medium grade; and "Black Prince" may indicate the lowest grade; but not so with the check-mark, and this is the mark now in question, for it indicates origin, and, incidentally, first, second, and low-grade nails of complainant's manufacture, but which of these grades is not determined by the check-mark, but by either the word "Capewell," or the words "Black Prince," or in some other way.

The defendant insists that this check-mark is so indefinite in size and shape that it is not valid as a trade-mark, and, again, that the complainant is endeavoring to appropriate as its trade-mark "the appearance of a horseshoe nail having check-marks on its head," and, also, the nail itself. I do not find merit in this contention. It is clear to my mind that the picture of a pig's foot on packages containing pickled pig's feet would be descriptive merely, and not a valid trademark for that article. So of a bronzed, or red, or black, or blue horseshoe nail as a trade-mark for horseshoe nails; it would be descriptive merely. Putnam Nail Company v. Dulaney, 140 Pa. 205, 212, 21 Atl. 391, 11 L. R. A. 524, 23 Am. St. Rep. 228. So in Ex parte Underwood Typewriter Co., 131 O. G. 2419, where the proposed trade-mark was a mere representation of the article to which it was to be applied. This check-mark is well defined in its form and dimensions and in the figure within those dimensions. It is not a rhomboid, but it has four sides; the upper and lower sides being parallel but unequal in length, the upper being the longest. The right and left hand sides are of equal length but not parallel. Within these boundaries are the check-marks. This trade-mark is as well defined as any trade-mark can be. Its area is coextensive with that of the beveled face of the head of the nail. It neither appropriates the form nor the appearance of the nail or its head. It is, of course, true that this trade-mark, when cut or engraved or pasted on the head of the nail, gives to the nail a distinctive appearance, some might say an ornamental appearance, and hence the exclusive right to use this checkmark placed on the beveled face of the head of the nail as a trademark includes the exclusive right to make and vend a horseshoe nail of that particular appearance.

But as a trade-mark is designed to be placed on the goods, or on the package containing them, and may be placed on either the one or the other, I do not see that this fact invalidates complainant's trade-mark. Other manufacturers may adopt a trade-mark, and cut, impress, or engrave it on their horseshoe nails on the beveled face of the head, and thus give to their production a distinctive appearance, and so gain the exclusive right to make and vend nails of that particular appearance. In fact, if such were not the legitimate use and application of a trade-mark, in many cases it would fail of its purpose. Must the mark be applied to the back of the nail, or to some part of the article where it will not be seen, or must it be made so small that it will not give a distinctive appearance to the article? I know of no such requirement in the law.

The defendant also contends that as this alleged trade-mark, check-mark, consists of a design or ornamentation for a nail, and the complainant used the same in public for more than two years without applying for a design patent, it has abandoned such mark to the public, and cannot now register or claim it as a trade-mark. This check-mark was never adopted or used as a design for a horseshoe nail, or primarily for ornamentation. No design patent for the head of a horseshoe nail, however ornamental, could have been granted. Rowe v. Blodgett, 112 Fed. 61, 50 C. C. A. 120; Bradley v. Eccles, 126 Fed. 945, 949, 61 C. C. A. 669. However handsome and attractive this check-mark may have been and may be when imprinted on the nail, and however much it may have added or may add to the appearance of the nail when on the market, it was still capable of appropriation as a trade-mark. I know of no rule of law that requires a trade-mark to be nonattractive, ugly, or repulsive, or that prohibits the appropriation of a distinctive mark, otherwise proper for appropriation and use as such, as a trade-mark because beautiful and attractive.

The defendant also insists that this check-mark is not a valid trade-mark for the reason it is cut or stamped into or onto the nail itself, and therefore "consists in part of the very goods to which the mark is applied." Does it destroy the validity of a trade-mark, or prevent the adoption of a symbol, etc., as such, that it is applied by being cut or cast into or impressed upon the very material of the article, the origin of which it is designed it shall designate? Said the court in Candee v. Deere, 54 Ill. 439, 5 Am. Rep. 125:

"That it must be attached to the article manufactured, in such a way as to be reasonably durable and visible, is also conceded. It must have a practical existence, not resting in the thought of the owner, but stamped or impressed, or attached in some way, to the article itself."

"Hero" and "Heroine" stamped on glass jars was held proper and sufficient. Rowley v. Houghton, 2 Brewst. (Pa.) 303. See, also, Robert v. Grandjean, 28 Annales, 145; Browne on Trade-Marks, § 89.

Advertising a mark as a trade-mark, or publishing or claiming it as such, however extensively this is done, or even registering it, does not make it a trade-mark. That is accomplished by the adoption and use of it as such. This inheres in the very definition of a trade-mark, and has been repeatedly decided. Browne on Trade-Marks, § 306, p. 312, and sections 52, 53, and 54, pp. 58, 59:

"A trade-mark, therefore, consists of the use in trade of such a mark, placed upon goods manufactured by a particular person, and placed in market with such marks, for sale and trade. Adams v. Heisel (C. C.) 31 Fed. 279. * * *

"Symbols or devices used by a manufacturer or merchant to distinguish the products, manufactures, or merchandise which he produces, manufactures, or sells, from that of others, are called and known by the name of 'trade-marks.' Amoskeag Mfg. Co. v. Trainer, 101 U. S. 51–56, 25 L. Ed. 993."

In this case the complainant has very fully supplied the evidence lacking in Capewell Horse Nail Company v. Putnam Nail Company (C. C.) 140 Fed. 670, in every aspect of the case, and it is not necessary to go further into the questions there discussed.

It is established to my satisfaction that this well-defined check-mark was first appropriated and adopted by the complainant as a trade-mark and its trade-mark, and that it was so adopted and appropriated and thereafter used primarily for the purpose of identifying and distinguishing the goods—horse nails—of complainant's manufacture from those of all other makers, and not as an incident of manufacture or primarily for ornamentation; that it was the proper subject of such appropriation and adoption and use, and that the fact of such adoption and appropriation was extensively and sufficiently made known to the public by actual and continued use by complainant as such, same being affixed to its nails, and also by publications and otherwise; that by such use thereof on the said goods of complainant's manufacture such check-mark came to be generally known to the public as complainant's trade-mark, and its goods bearing such mark on the nail came to be publicly known and distinguished as those of complainant's make, and such mark became its property; that complainant never abandoned it, and that it was not the proper subject of a design patent; that after such adoption and long-continued use by complainant, and after such check-mark had come to be such well-known, distinguishing mark of the goods of complainant's manufacture, the defendant commenced making horseshoe nails bearing this check-mark on the beveled face of the head, and that the making of such check-mark on defendant's nails was neither a necessary incident of manufacture nor a necessary result in the course of manufacture, but, on the contrary, the defendant adopted and designed or changed its machinery for use in the making of its nails so that it would place such check-mark thereon for the purpose of simulating complainant's nails and producing confusion in the mind of dealers and users and selling its nails as those of complainant's make. The complainant had a common-law right and title to this check-mark as its trade-mark, and was entitled to have it registered as its trade-mark irrespective of the so-called 10 years' clause of the act of February 20, 1905, c. 592, § 5, 33 Stat. 724 (U. S. Comp. St. Supp. 1907, p. 1010). I cannot find that this check-mark had been used exclusively by the complainant for more than 10 years next preceding the passage of the act of February 20, 1905, as there is evidence that others used it during some part of that 10 years but after its adoption and use as a trade-mark by complainant.

The complainant is not estopped in any sense from claiming this as its trade-mark and asserting its rights in this action on the ground that the person who made oath to the declaration made a false oath in obtaining the registration. At the time the oath was made by Williams it was not understood that "exclusive" would be held to mean that a person claiming a trade-mark would be excluded from registration under the 10 years' clause, should it appear that some person had infringed; that is, had used the same mark in violation of the alleged rights of the other person claiming it and claiming registration. See Worcester Brewing Co. v. Reunter & Co., 128 O. G. 1687; Id., 133 O. G. 1190 (March 31, 1908).

I think and hold that under the facts of the case the statement that "such use has been exclusive" was surplusage. It does not affect the registration, nor does it affect complainant's right to maintain this action. The voluminous records and exhaustive briefs have been examined with care, and I am satisfied that defendant infringes the lawful trade-mark of the complainant.

There will be the usual decree accordingly.