## LOONEN v. DEITSCH et al.

(Circuit Court, S. D. New York. May 2, 1911.)

1. TRADE-MARKS AND TRADE-NAMES (§ 22*)—CHARACTER OF MARK—SUGGESTIVENESS.

Where a red cross, used as a trade-mark on toothbrushes prior to 1905, was only suggestive of asepsis and general cleanliness, and not descriptive of the general character of the brush, and was not intended to imply consent or approval of its use by the Red Cross Society, it was not objectionable as being either illegal or deceitful in itself.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 25; Dec. Dig. § 22.*]

2. TRADE-MARKS AND TRADE-NAMES (§ 22*)—VALIDITY—BAD FAITH.

Where complainant used a red cross as a trade-mark on toothbrushes, the fact that he added the words "Red Cross Brush" or "Red Cross" did not convict him of bad faith as indicating that the brushes had been adopted by or had anything to do with the Red Cross Society.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 25; Dec. Dig. § 22.*]

3. TRADE-MARKS AND TRADE-NAMES (§ 31*)—EXTENT OF USE.

Plaintiff adopted a red cross as a trade-mark on toothbrushes with the words "Red Cross Brush." Before 1904 the only brushes bearing the mark had been a line of "Comilo" brushes. In 1904 complainant, finding the sales of these brushes to be falling off, began making and sending a bone brush to supply his trade in the United States, to which he added the red cross mark and the words "Red Cross Hygienic," which brushes he continued to ship in large quantities, and the "Comilo" in small quantities, until suit was brought, also shipping other brushes without the mark. *Held*, that the mark was not originally used to indicate "Comilo" brushes only, and complainant was not limited to its use on such brushes.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 35; Dec. Dig. § 31.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs 1907 to date, & Rep'r Indexes

4. TRADE-MARKS AND TRADE-NAMES (§ 93*)—CHARACTER OF MARK—QUALITY.
    Evidence *held* insufficient to indicate that complainant adopted the red
' · cross as a trade-mark for toothbrushes to indicate quality only.
    [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec.
Dig. § 93.*]

5. TRADE-MARKS AND TRADE-NAMES (§ 2*)—NATURE OF MARK—PUBLIC POL-
    ICY.
    Under Acts Cong. Jan. 5, 1905, c. 23, 33 Stat. 599 (U. S. Comp. St. Supp.
1909, p. 1038), and June 23, 1910, c. 372, 36 Stat. 604, declaring that the
use of the red cross as a trade-mark should be permitted where its use
antedated 1905, it could not be said that the use of such trade-mark on
toothbrushes antedating that date was contrary to public policy.
    [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec.
Dig. § 2.*]

6. TRADE-MARKS AND TRADE-NAMES (§ 25½,* New, vol. 6, Key No. Series)—
    NUMBER OF TRADE-MARKS.
    Where complainant, a manufacturer of toothbrushes, used as trade-
 · marks on the back a star-inclosed "L" and the word "Comilo," and there-
° after placed on the front of the handle a red cross and the legend "Red
Cross Brush," and the latter mark was shown to have been accepted by
the public as indicating brushes made by complainant, it was no objec-
tion to complainant's use thereof that he had previously adopted and still
used the marks on the back.

In Equity. Bill by Charles Loonen against Charles Deitsch and an-
other. Decree for complainant.

See, also, 152 Fed. 1023.

Archibald Cox and C. P. Goepel, for complainant.

Joseph L. Levy, for defendants.

HAND, District Judge. The defense here is based upon six lines:
First, that the mark is bad because adopted for purposes of deceit and
therefore not primarily a mark of ownership at all; second, because
the use has not been sufficiently shown to justify the presumption of a
trade-mark; third, because the complainant, being guilty of fraud, has
no standing in a court of equity; fourth, because the original use was to
indicate only Comilo brushes and could not be extended to bone brush-
es, after the defendants had begun to make them; fifth, because it is
against public policy to allow the Red Cross to become a mark at least
without "lawful right" prior to 1905, which has not here been shown;
sixth, because a man may not use more than two marks on the same
class of goods.

[1] As to the first point, Loonen swears that he adopted the mark
because his star mark was too small, and he wanted something showy
to catch the eye. Though he denies that he supposed the symbol meant
anything hygienic or sanitary, I cannot help thinking that he did at-
tach some such meaning to its use in spite of his disclaimer. It is al-
most incredible that he should otherwise have chosen that particular
mark for that particular purpose. However that may be, the question
at this time is not what he meant but what he did. There is without a
doubt a suggestion in the term that is related to asepsis and sanitary
conditions, and it is almost certainly the case that the commercial uses
of the symbol arose from the fact that the Red Cross Society was con-

cerned with field surgery and with the care of, and supplies for, the sick and wounded in battles and great public catastrophes. All such commercial uses have, I believe, been of a kind congruous and analogous to the activities of the society itself, or at least vaguely suggestive of asepsis and general cleanliness. No one, for example, would be likely to sell Red Cross umbrellas, or Red Cross neckties or Red Cross ink. Those goods which are benefited by cleanliness and hygienic preparation are the only ones which so far as I know have been covered by the mark. The spread of popular information regarding the therapeutic value of cleanliness has created a strong predilection for anything suggestive of such methods. Merchants have been quick to take advantage of this education of the public and to indicate that their wares partake of such a character. The Red Cross is an easily caught symbol with an indefinite atmosphere, a kind of aseptic aura, connotating clean preparation and careful protection from dirt. The complainant did only what others have done in exploiting that popular conviction, and the conclusion is pretty clear that those who so selected it not only had some such reason in mind, but succeeded in making the suggestion they intended to others. That, however, is not enough to make the mark bad. Of course it must not be descriptive; but suggestion is one thing, and description, another. A good collection of the authorities may be found in Trinidad Asphalt Mfg. Co. v. Standard Paint Co., 163 Fed. 977, at pages 986–988, 90 C. C. A. 195; Johnson v. Seabury, 71 N. J. Eq. 750, 67 Atl. 36, 12 L. R. A. (N. S.) 1201, 124 Am. St. Rep. 1007, does not decide the question, because the court treated the case as one of secondary meaning. Perhaps that was due to the fact that originally the complainant had deliberately stated that the mark was used with the authority of the society, but the case still remains inconclusive here. Johnson v. Brunor (C. C.) 107 Fed. 466, is too scantily reported to know what was the basis of Judge Lacombe's decision. Nor does Johnson v. Bauer & Black, 82 Fed. 662, 27 C. C. A. 374, pass upon it. The authorities therefore appear to be inconclusive. Suggestiveness not being a defect, the question comes down, therefore, to this: Does the mark actually mean that the society is in any way concerned with the manufacture of the goods? I think not. We have become familiar with it in the past for many other uses than that of the society, though happily such uses will now slowly disappear. It has been used on hospital ambulances, upon medicaments, upon doctors' motor cars, upon barber shops, upon laundries, and for military field service not connected with the Red Cross Society. In short, until the legislation of 1905 (Act Jan. 5, 1905, c. 23, 33 Stat. 599 [U. S. Comp. St. Supp. 1909, p. 1038]), it had been quite instinctively adopted for many uses which were congruous with the chief objects of the society, but which did not indicate that the society had anything to do with them, or certainly with the frequency of the use ceased to do so. Finally, Congress has clearly recognized that fact by permitting all those who prior to 1905 had used the mark lawfully, to continue. This appears beyond question in the act of June 23, 1910, c. 372, 36 Stat. 604. Such "lawful use" does not imply the consent of the society, but only that there should be such use as would create a

mark were it not the Red Cross. Therefore, the mark is not invalid as being either illegal or deceitful in itself.

The next point is of the insufficiency of the use proved. I cannot understand the defendants' position in this regard, for it is hardly comprehensible that they actually suppose, as they keep repeating that only three shipments were made. All the complainant's witnesses testify to a continuous shipment and sale of toothbrushes so marked, either Comilo or bone, from August, 1899, down to the beginning of the suit. The single thread of justification for this disregard of all that testimony is the fact that Lotter from the books identified the entry of the first shipment of each number, "42," "2742," and "1498." That this was his only purpose is apparent to anyone who reads the testimony in the least impartially or as a whole, because no one can construe the testimony as confining the shipments to those three without perversely twisting its sense.

[2] The third defense is of the complainant's bad faith, disqualifying him from relief in a court of equity. This is to a large extent involved in the prior consideration of the mark, and in so far forth it falls with a decision that the mark is good, as neither descriptive nor misleading. There is, however, the question of whether it was fraudulent to add the words "the Red Cross Brush," or "Red Cross," to the symbol itself. The phrase "Brush of the Red Cross" is quite a different matter from "Red Cross Brush" and Loonen only used the latter. "Brosse de lar Croix Rouge" does not mean "Brush of the Red Cross," but "Red Cross Brush." It would be meaningless in French to say "Rouge Croix Brosse," and on that account a strictly literal translation of the French phrase which Loonen used does not correctly represent even what he did in France. "Red Cross Brush" is like "Red Cross Pharmacy" or "Red Cross Plaster;" it means as much and no more that the brush has anything to do with the Red Cross Society, as the symbol alone, for it neither adds to, nor takes from, the suggestion and the connotation of the symbol itself. There was then in this no more fraud than if the legend had been omitted.

[3] The fourth defense is that the mark was specific to the Comilo brush, and its use upon the bone brush, an attempt to create a new mark. Before 1904 the only brushes bearing the mark had been the Comilo, and it was coupled with the words "The Red Cross Brush." It does not certainly appear that all Comilo brushes bore the mark and legend, though I think it fairly plain from Gibson's testimony that if any such brushes did not bear the mark they were few, and what he calls "seconds." Moreover, it appears that between 1899 and 1904 the complainant shipped other brushes to the United States than the Comilo, so that all his goods did not bear the Red Cross. In 1904 finding the sale of Comilo brushes to be falling off—possibly because the defendants had already begun to use his mark in 1903—the complainant began making and sending a bone brush which is in evidence and which bears the Red Cross and the words "Red Cross Hygienic." These bone brushes he continued shipping in large quantities and Comilo in small quantities until the suit was brought, also shipping other kinds of brushes without the mark. Now the only

possible ground for saying that the use of the Red Cross only on Comilo brushes limited it to such brushes is this: That it thereby became a mark for that quality or grade of brush, because certainly no one can suppose that a mark actually intended, and supposed, to express origin becomes any the less effectively a trade-mark because it is used only upon a part of the maker's goods. If Loonen wished to push this particular brush, the Comilo, more than others, there is no more reason why he should not have put upon it his best and most showy mark, than why he should not have given it a disproportionate amount of advertising, or made his name more prominent upon it than on his other brushes. In short, there is no necessary connection between the use of a mark upon a limited class of the maker's wares and its denoting that class of wares.

[4] The question, therefore, is whether, as matter of fact, this mark did denote quality and quality only. First, it must be noted that this kind of brush already had a name, "Comilo," coined by the patentee, Loonen's assignor, and composed out of the names of the chemical elements which went to make up the handle. This was indubitably one name for that kind of brush, which Loonen had not invented, and which meant the brush made under Wallach's patent. Was the Red Cross Brush another name for the same kind of brush or was it a mark of Loonen's make? So far as intent goes, the only evidence is that of Loonen himself, and he says that it merely meant his manufacture. There is no reason to suppose that he affixed it so that the public or anyone else should identify the word with that particular brush which had been so long before given a name of its own. Did, then, the name come to be understood as meaning that kind, and that only, whatever it may have originally been intended to cover? Where the mark was not intended to cover a quality, but general origin, there must be some affirmative proof that it has got a use other than that for which it was intended, before it can be set down as the name of a species only, because the presumption is that it means to others what it was intended and used to mean. There have been several cases where words originally used to indicate qualities or grades have in time got an added significance of the origin or make and have so become good trade-marks, but I know of none where a mark originally used for a trade-mark has come to be understood for a quality, because of its limited use upon only one kind of goods. There might, of course, be such a case in theory, but I doubt whether there ever has. In any event, such testimony as there is in the case at bar, and it is ample in amount, is that the mark always remained what it was meant to be, a symbol of general origin, for all the disinterested witnesses in the jobbing trade unanimously swear that they so regard it. The defendants present no one to the contrary, but one employé and Martin, who has been interested in the defendants' business for some years. It is true that the best proof would be from the ultimate consumer to whom such a mark is addressed, but that is practically not accessible, and the opinion of the jobbing trade is as near as one can get to the ultimate facts of what the consumer really understood the Red Cross to be. In the case of a commodity like a

toothbrush it is in addition extremely unlikely that consumers would distinguish the showy mark and legend as being only the name for one species of the brush made by the man whose name appeared upon the back of the handle in very small type. The chances are rather that they looked at and remembered only what caught their eye upon the front.

[5] The fifth defense is that it is against public policy to allow the Red Cross to become a trade-mark. This needs no answer after the Acts of 1905 and 1910. Whatever may have been the policy before, Congress has now definitely declared in the proviso of the latter act that it would permit such marks if they antedated 1905. Congress had power so to legalize the use of it; the question of public policy was for it and for it alone, and it is now finally closed. The decisions in the Patent Office appear to have conflicted, but Ex parte Batcheller Co., 85 Off. Gaz. Pat. Off. 1583 is later than Ex parte Chichester Co., 52 Off. Gaz. Pat. Off. 1061, and overrules it. The idea that the mark consists of the flag of a foreign nation deserves no notice.

[6] The sixth and final defense is that, having two marks already upon the brush, it was not lawful for Loonen to add a third, which he did when he added the Red Cross to the two marks, the star-enclosed "L," and the word "Comilo." Now, in principle, there is no possible ground for refusing to recognize any number of trade-marks which are really such. That is to say, if a man can show that the public has in fact come to recognize six marks each as separately indicating his manufacture, even though they are used together, it should be no concern of the court to interfere. The hypothesis presupposes that the public does interpret the marks each as indicating origin or manufacture, and that is simply a question of fact, though it might be a very hard thing to prove, especially if the marks were all put near together on the article. If a man uses four or five marks together, it may be, therefore, doubtful whether as matter of fact any single one had ever got to mean his goods, but the trouble is merely one of fact, and there is no reason that I can see, why if that fact exists, the court should take from him the means he has created of identifying his wares. In Candee v. Deere, 54 Ill. 439, 5 Am. Rep. 125, there is talk of confusion, but that begs the question, for if it be a true trade-mark alone, there can be no confusion. Certainly if the public has solved that difficulty of more than one mark, the court becomes officious in forbidding the maker from continuing to use what the public already understands.

So the question here is whether, in spite of Loonen's other marks, the public should be supposed to have become used enough to the Red Cross to understand it for his trade-mark, when used alone. Both the Comilo and the star-inclosed "L" were on the back of the handle close together, and both were small, indeed, the star-inclosed "L" requires some perceptible effort of attention to observe. On the other hand the Red Cross is on the front of the handle and in the midst of the legend, "The Red Cross Brush." Together they catch the eye as nothing else on the brush does, being sprawled all across the whole top of the handle, as the brush lies on its back. What-

ever the public may have thought of what was on the back, they could not but have been impressed by the conspicuousness of the legend and symbol. The man in the street would have no possible trouble in deciding upon what would catch the eye, and remain in the memory of most users. As matter of fact there is not the least question to my mind that a man using this toothbrush would remember it as "the Red Cross Brush," not as Loonen's, or "Comilo," or by the star-inclosed "L." If the question were whether the Red Cross mark might not have swamped the other marks, I should find it less plain.

One authority, Candee v. Deere, supra, at page 457, 54 Ill. (5 Am. Rep. 125), contains a passage that no one may have more than one mark, but, so far as I can see, it was a purely obiter generalization at the outset of the opinion, not called for by any of the facts and the basis of no part of the reasoning upon which the decision depended. Albany Perforated, etc., Co. v. John Hoberg Co. (C. C.) 102 Fed. 157, contains a dictum in agreement, but the case went off on the idea of marks of quality. These are the only cases which I have seen which even suggest that the law will not recognize more than one mark, if the public already has done so. There are, it is true, other cases in which the question is suggested without being answered, showing perhaps, that the court regarded it as still open, but they are not authorities to the contrary. On the other hand, in Wheeler v. Johnston, 3 L. R. Ir. 284, the Vice Chancellor of Ireland directly held the contrary. Several of the other cases which the complainant cites did not involve this question, and are not properly applicable. In Capewell Horse Nail Co. v. Mooney (C. C.) 167 Fed. 575; Id., 172 Fed. 826, 97 C. C. A. 248, the marks were not used together, but one was used on the box and another on the nails. That makes it of less authority than if both marks had been on the nails, but in so far as Candee v. Deere, supra, can be supposed to rest upon any principle of law, which I must confess with deference I do not altogether see, this case is an answer to it, because Candee v. Deere was based upon the possibility of confusion between the marks, and there is as much danger of confusion when the marks are used one on the nail and the other on the box as though both were always used on either or both. Indeed, I should think that the risk of confusion was greater where they were not used together. Therefore, while the authority is small, what there is of it accords with my judgment that there is no objection to as many trade-marks as the trade will in fact assimilate.

There is nothing in the defendants' multitudinous objections to the testimony. All testimony not dependent upon the witnesses' memory could be struck from the record and it would show by the most unquestionable evidence that the sales in this country have been large and continuous since 1899.

Now that the interference proceedings have been decided the complainant may likewise include in his decree the registered mark. His own trade is interstate, and so is the defendants', and the mark is valid under the statute as well as at common law, though I have considered it throughout as a common-law case.

Let the usual decree pass, with costs on both grounds.