AUTOMATIC RECORDING SAFE CO. v. BANKERS' REGISTERING SAFE CO. et al.

(District Court, N. D. Illinois, E. D.   June 7, 1915.)

No. 172.

1. PATENTS ⟨Key⟩328—VALIDITY AND INFRINGEMENT—RECORDING COIN SAFE.
    The Fisher patent, No. 793,779, for a recording safe for holding coins, discloses invention and is valid; claim 8 also *held* infringed.

2. PATENTS ⟨Key⟩165—CONSTRUCTION OF CLAIMS—LIMITATION BY AMENDMENT.
    When an applicant for a patent, having devised a new mode of operation, in order to meet a reference amends a claim by inserting a limitation which modifies the operation, such limitation is a material one, even though the amendment was unnecessary because the combination as a whole was new.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 241; Dec. Dig. ⟨Key⟩165.]

3. PATENTS ⟨Key⟩328—VALIDITY AND INFRINGEMENT—RECORDING COIN SAFE.
    The Fisher patents, No. 990,534, claim 7, No. 990,535, and No. 1,073,847, all relating to recording safes for holding coins, *held* valid, but not infringed.

4. PATENTS ⟨Key⟩328—VALIDITY AND INFRINGEMENT—RECORDING COIN SAFE.
    The Thompson patent, No. 758,340, claim 4, for a recording safe for holding coins, *held* valid, but not infringed.

5. TRADE-MARKS AND TRADE-NAMES ⟨Key⟩3—VALIDITY—TELLER AS NAME OF COIN SAFE.
    The word "Teller" *held* a valid trade-mark for a recording safe for holding coin, and also infringed.
    [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 4–7; Dec. Dig. ⟨Key⟩3.]

6. TRADE-MARKS AND TRADE-NAMES ⟨Key⟩70—UNFAIR COMPETITION—IMITATING FORM OF ARTICLE.
    The manufacture and sale by defendant of a coin safe so nearly resembling complainant's patented safe, previously in the market, that it could be distinguished only by careful examination, and that purchasers were in fact deceived, *held* to constitute unfair competition.
    [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. ⟨Key⟩70.]

---

⟨Key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the Automatic Recording Safe Company against the Bankers' Registering Safe Company, the White Brass Castings Company, Forrest B. Page, Gerald G. Barry, John C. Farwell, and W. A. Winterburn. On final hearing. Decree for complainant.

Dyrenforth, Lee, Chritton & Wiles, of Chicago, Ill., for complainant.

Gerald G. Barry and John C. Farwell, both of Chicago, Ill., for defendants.

SANBORN, District Judge. Injunction suit to restrain unfair competition, infringement of trade-mark "Teller," and infringement of patents relating to recording safes used by depositors in savings banks for the temporary collection of coins. The main patent relied on was issued to Charles Fisher July 4, 1905 (application March 24, 1904), No. 793,779, all the claims being involved; also claim of patent to Robert J. Thompson, No. 758,340, April 26, 1904, claim 7, Fisher patent, No. 990,534, April 25, 1911, claim 6, Fisher patent, No. 990,-535, April 25, 1911, and claims 1, 2, and 5, Fisher patent, No. 1,073,-847, September 23, 1913.

Three other suits involving the same patents were heard about the same time and are decided herewith. One of them is in the Southern District of New York, Automatic Recording Safe Co. v. Burns Co., 224 Fed. 513, another is Automatic Recording Safe Co. v. W. F. Burns Co., 224 Fed. 512, in this district, and the third in the Western district of Wisconsin, Automatic Recording Safe Co. v. Savings Loan & Trust Co., 224 Fed. 513.

The safes in question are made of nickel steel, about the size of a small flatiron, oval in shape, and comprising a coin stack with six cylinders, open at the top and slotted at the outer side. This is known as the core. Over this fits tightly the other part of the device, called the casing (like a skullcap), with a small lock under the top, engaging with the top of the core, by which the two parts are detachably secured together while the coins are being gradually deposited. Opposite the top of each coin compartment of the core there is a coin admission slot in the casing, with a spring slot guard to prevent withdrawal. The recording feature is secured by small holes through the casing opposite each coin stack, through which the height of the stack of collected coins may be seen and the amount estimated.

Aside from the trade-mark and unfair business questions, the main inquiry is whether the first five claims of the first Fisher patent so narrow the invention as to render it practically valueless. The gist of the invention was a new mode of operation thus described by the patentee:

"The primary object of my invention is to provide a portable savings bank in which the various denominations of coins when the bank is opened may be kept separate and at the same time be accessible to the teller, so that he may readily count the coins without first having to assort them according to their denominations."

This feature was novel, and there was nothing in the prosecution of the application which in any way affects it. For instance, claim 1

was twice amended before allowance, but this novel idea of separation and accessibility is present in all the three forms. The amendments are shown in parentheses:

"1. In a portable savings bank, a core comprising a plurality of (rigid) vertical flanges spaced apart to form compartments to receive coins (the distance between the flanges of each compartment being greater than the diameter of the coins to be received by such compartment), the adjacent flanges being united at corresponding ends by walls adapted to partially surround the coins."

Both these amendments were made on prior patents not containing the mode of operation referred to, where the coins were separated and counted before deposit, and remain so when the safe is unlocked by the receiving teller of the bank. Complainant argues that the doctrine of Winans v. Denmead, 15 How. 330, 14 L. Ed. 717, should be applied, where a hopper was applied to an ore car; but the form of the hopper was by the claim limited to the frustrum of a cone. The patent was held to cover an octagonal form. It is said that the rigid, flaring flanges form no part of the real invention, which was the new mode of operation, and that defendants' banks, with rigid flanges slightly converging, should be held to infringe, because the true invention does not reside in a mere change of form, but in a new principle. As the change in the Patent Office from converging to diverging flanges only slightly affects the mode of operation may they be held equivalent? In order to fully understand this question further explanation is given.

The recording safes in question sold by complainant have had quite a remarkable history. Starting on a capital of $4,000 the business has stood a total expense of about $500,000, all paid out of earnings, while the sales have exceeded 1,000,000 in number. A considerable part of the business also depends upon the placing of the safes among prospective depositors in banks through the work of salesmen or solicitors who represent the banks, and who sometimes guarantee the latter that the account of the purchaser of a safe will continue for a certain time. In addition to this method of sale it appears that more than half of the demand for the recording safe comes directly from savings banks and trust companies, mainly through advertising or the solicitation of traveling salesmen.

The history and development of complainant's business are described by its counsel, and shown by the proofs, substantially as follows:

In the year 1902, Robert J. Thompson and Alexander H. Revell, realizing the desirability of a plural-compartment recording safe for use by banking institutions and trust companies, entered into an arrangement whereby a recording safe, suitable for the purpose, should be produced by Mr. Thompson and placed upon the market by Messrs. Thompson and Revell. Thompson devised the construction shown in patent No. 758,340, and during the period 1902–1904 the device was placed on the market by Messrs. Thompson and Revell, doing business in the name of the Automatic Recording Bank Company. The Thompson recording safe proved to be expensive in manufacture, mechanically deficient in some particulars, and lacking in the mode of operation which was afterwards introduced into the recording safe art by Mr. Fisher. Only a very few thousand (perhaps about 3,000) of the Thompson recording safes were sold, and it was afterwards necessary to replace these safes with the Fisher recording safe. The recording safe shown in Fisher

patent, No. 793,779, was devised to overcome the defects of the Thompson recording safe. Fisher conceived the idea of a recording safe comprising two main telescopically related complemental parts or elements, viz.: (a) A core comprising a base and open-sided or accessible coin receptacles rising from the base, the core being provided with a locking member; (b) a coin-slotted, guard-equipped, and lock-provided casing within which the core snugly fits and is detachably locked. The coin-receptacles of the core were grouped about a common center; and the vertical wall of the casing was provided near its upper end with a series of coin slots corresponding with the several coin compartments, while the slot guards were arranged in an annular series beneath the top wall of the casing. When the parts were assembled, the vertical wall of the casing served to cover the outer vertical openings of the coin receptacles. It was important that, in filling the safe with coins, they should be permitted to drop freely and be stacked flatwise in the coin receptacles.

The new mode of operation introduced in the savings bank art by Fisher will be clearly understood from Figure 3 of the drawing of the Fisher patent. The new mode of operation introduced was that by removing the cover the receiving teller at the bank was able to leave the core standing on the counter with the coins assorted according to denomination and arranged in stacks, these stacks being capable of being removed one by one from their respective compartments, thus saving the slow, laborious work of assorting the coins and economizing the time of the busy and hard-worked employé of the banking institution. The approval of the bank officers was an important factor in the success of the device, and one of the chief objects was to produce a bank so convenient as to be entirely satisfactory to the receiving teller. From the viewpoint of the customer it was made of convenient size, simple in structure, mechanically desirable, sanitary, and cheap. But the most important feature was the mode of operation described.

The idea of unlocking and removing a casing having coin-admission means from a core having open-sided coin receptacles, thus leaving the coins accessible to removal in stacks, and avoiding the necessity of assorting the coins (which was necessary with the Thompson patent, where the contents of the bank were dumped by the teller), is employed in all complainant's recording safe product and by all of the defendants in the suits referred to.

About May, 1904, the National Recording Safe Company was incorporated, Revell, Thompson, and Fisher being the directors, and the Fisher recording safe was placed upon the market in the cylindrical form shown in the first Fisher patent. Between 300,000 and 400,000 in this particular embodiment were marketed. In the latter part of the year 1909, the National Recording Safe Company made arrangements for marketing its recording safe in the oval form, and with the outer, lateral openings of the coin compartments contracted somewhat. This form was placed upon the market in April, 1910, and between 500,000 and 700,000 of the oval form of safes have been sold by complainant. Late in the year 1909, complainant arranged with the White Company to manufacture complainant's product; and in April of 1910 complainant began the marketing of its oval form recording safes under the trade-mark "Teller," associated with various auxiliary words, such as "Savings," "Traveling," etc. For three or four years complainant's product was practically all manufactured by the White Company, and shipped directly by that company to complainant's customers. A large number of details of improvement were perfected and developed by Mr. Fisher at complainant's expense, and numerous patents were taken for such features of improvement as were of a patentable order. All of the refinements in construction and appearance, whether of a patentable order or not, were developed at complainant's expense, and the arbitrary markings and all the details of size, exact curvature, appearance, color, and finish, were worked out by it; and during this period of development, all the secrets of manufacture and invention were made known to and learned by the White Company, while enjoying complainant's patronage during a period when between $100,000 and $150,000 was paid to it by complainant. The expense for all of the dies and special tools, the expense of procuring the patents, and the expense of introducing and making known the recording safe throughout the United States, was borne by complainant.

During the year 1913 complainant began to transfer its business to another

factory, where the stamped core and spider could be made in lieu of the die-molded cast core and spider, which the White Company was accustomed to manufacture for complainant. The White Company continued, however, to manufacture for complainant and to ship goods to complainant's customers. During this period the White Company entered upon the manufacture of a recording safe for itself, known as "Depositor's Teller," in which it copied the latest form of the device, together with the trade-mark "Teller," and copied also the "Savings Teller," so that they can hardly be distinguished. While it is true that these savings banks are sold mainly to bank officers, who would not be easily deceived, yet some confusion in the trade actually resulted.

A preliminary injunction against unfair competition was granted against the White Company, and the latter then arranged with the Burns Company in New York, whereby the latter took up the sale of the White Company product as its own, omitting the word "Teller." Suit was brought in New York against the Burns Company, in which Judge Julius M. Mayer granted a preliminary injunction, based on claim 8 of the first Fisher patent.

[1] The validity of the first Fisher patent must depend wholly on the novelty of the mode of operation described and the utility of the device itself. There was nothing new in the telescoping feature, as the old collar boxes' and poker chip holders show. It is also in Wolf, No. 690,544, and Rowley, No. 268,296, for coin holders. But the idea of removing the case and leaving the coins in stacked and counted relation, ready for rapid handling by a bank teller, was a new one, and of much utility, as the success of the Fisher bank has demonstrated. It is true that good business methods have been partly influential in this result, but, as Mr. Revell testified:

"I never found anything that was constant in its movement over a course of years that succeeded by salesmanship. It had to have the merit under the salesmanship or it could not go on."

[2] The first five claims in the first Fisher patent limit the invention to coin compartments whose flanges are so spaced apart as to make the compartment wider than the coins, enabling the latter to be removed in a lateral direction. This is not true of defendants' bank. As this limitation modifies the mode of operation, it is a material one. When a patentee, having devised a new mode of operation, in order to meet a reference, amends a claim by inserting a limitation which modifies the operation, such limitation is a material one, even though such amendment was unnecessary because the combination as a whole was new. If the change does not affect the operation of the device, the limitation may, in a proper case, be disregarded by the rule of Winans v. Denmead, where the limitation did not affect the mode of operation. In the Fisher application the spacing apart of the compartment flanges does slightly affect the new mode of operation discovered by him, and must be respected. I am not prepared, therefore, to hold that claim 1 is infringed. In view of claim 8, it is at present unnecessary to do so. Defendants' construction operates substantially the same as that covered by claims 1, 5, 6, and 7, accomplishing the same result in substantially the same manner; but in view of the limitations as to spacing apart and central compartment in these claims it is at present unnecessary to decide these claims to be infringed.

The sixth and seventh claims of No. 793,779 include a central compartment between the coin chutes, which is absent in defendants' device. The eighth claim does not contain either one of the limitations of the first five, nor of the sixth or seventh, and is infringed. The only difference between the two constructions is the position of the lock slot. This in no way modifies the new mode of operation, and in view of the character of the invention a change in the position or character of the lock is of no consequence. The two forms are mechanically equivalent. The eighth claim should be, therefore, held infringed. Hillard v. Fisher Book Typewriter Co., 159 Fed. 439, 86 C. C. A. 469; J. L. Owens Co. v. Twin City Separator Co., 168 Fed. 259, 93 C. C. A. 561.

[3] The Fisher patent, No. 990,534 (claim 7), should be sustained as a specific one, but is not infringed.

Patents No. 990,535 and 1,073,847, sued on, relate to the spring slot guards. The claims are specific ones, and defendants do not employ the precise form counted on. The patents are valid, and should be so decreed, but are not infringed.

[4] As to the Thompson patent, No. 758,340, claim 4: A combination is shown, consisting of a number of coin receptacles or compartments, coin slots registering with the compartments, and a plate under the top of the casing and above the compartments which holds the latter in place; the plate having projections or depressions into the tops of the compartments, operating like the spring slot guards shown in the Fisher forms. While the new mode of operation introduced by Fisher is not present, yet there is sufficient improvement over the earlier art to sustain the patent. The Thompson banks did not prove very satisfactory, however, and Fisher's improvement was necessary in order to remove the objections and make the device useful and successful. In regard to infringement it is evident that the very different mode of operation in defendants' bank, which was new in Fisher (defendants' being equivalent), entirely distinguished it from Thompson. The Thompson patent should be sustained, but held not infringed.

[5] In respect to the trade-mark "Teller," it seems clearly valid. It is of a suggestive character, but of the right kind, as in the case of "Roof Leak" for paint, as just decided in this court in Elliott Varnish Co. v. Sears, Roebuck & Co. (D. C.) 221 Fed. 797. Loonen v. Dietsch (C. C.) 189 Fed. 487, where plaintiff used a red cross as a trade-mark for a tooth brush, may also be referred to. A long list of terms held descriptive, and so not subject to appropriation as trade-marks, is given in the main opinion in Trinidad Asphalt Co. v. Standard Paint Co., 163 Fed. 977, 90 C. C. A. 195, and a similar list held good trademarks in the dissenting opinion, pages 987, 988.

[6] As to unfair trade, defendants have made and sold a bank which can be distinguished from complainant's form only by careful examination, and the proof shows sufficient proof of actual confusion and deception. It is true that the purchasers of these safes are bankers, and that the articles are not sold to the public generally; however, even bankers may be deceived, as the evidence shows.

Pope Automatic Merchandising Co. v. McCrum-Howell· Co., 191 Fed. 979, 112 C. C. A. 391, 40 L. R. A. (N. S.) 463, in this circuit, is cited by defendants, and it is urged that the form adopted by both parties is strictly utilitarian, and therefore may be copied without lawful objection. In that case there was no patent covering the invention, while in this the form of the device will become public property upon the expiration of the Fisher patents.

There should be a decree adjudging the validity of all the claims sued on and of the complainant's trade-mark. All such claims should be held not infringed, except claim ·8 of the first Fisher patent. An injunction and accounting, as prayed, should be awarded, including an injunction against unfair trade. Complainant should have costs, although all the claims but one are not infringed, because of the violation of the trade-mark and the unfair competition.